**UNITED STATES of America,**
**Plaintiff,**

**v.**

**Rodolfo TERRIQUES, Defendant.**

No. 4:01CR3119.

United States District Court,
D. Nebraska.

April 23, 2002.

Janice M. Lipovsky, Assistant U.S. Attorney, Lincoln, NE, for United States.

John C. Vanderslice, Federal Public Defender's Office, Lincoln, NE, for Defendant.

### MEMORANDUM AND ORDER

KOPF, Chief Judge.

This matter is before the court on the Magistrate Judge's Report and Recommendation (filing 19) recommending denial of Defendant's motion to suppress. No objections to the Report and Recommendation have been filed as allowed by 28 U.S.C. § 636(b)(1)(C) and NELR 72.4.

I have conducted, pursuant to 28 U.S.C. § 636(b)(1) and NELR 72.4, a de novo review of the Report and Recommendation. Inasmuch as Judge Piester has fully, carefully, and correctly applied the law to the facts, I need only state that the Recommendation (filing 19) should be adopted and Defendant's motion to suppress (filing 10) should be denied.

I assume familiarity with the facts detailed in the Report and Recommendation. I specifically find that the evidence establishes that Defendant has standing to challenge the seizure and search of the Express Mail package. I next find that postal clerk Leon's actions in holding the Express Mail package for 30 seconds and then handing it to postal inspectors rather than placing it in the bag of mail to be transported on an airline flight to the destination state did not constitute a detention or seizure. Since Leon's actions were not a detention or a seizure, they were not

required to be preceded by reasonable, articulable suspicion of criminal activity. *United States v. Demoss*, 279 F.3d 632, 635–36 (8th Cir.2002) (briefly lifting express mail package from a conveyor belt for visual observation by officer was not a "seizure," so no reasonable, articulable suspicion was needed); *United States v. Vasquez*, 213 F.3d 425, (8th Cir.2000) (officers' action in picking up package to examine its interior is not a detention requiring reasonable, articulable suspicion because, at that point, the officers had not delayed or otherwise interfered with the normal processing of the package). This finding alone would be sufficient reason to deny the portion of the motion to suppress based on removal of the package from normal processing.[1] However, I further find that if the subsequent detention of the package by postal inspectors for a canine sniff was a "seizure,"[2] it did not violate the Fourth Amendment because it was "supported by an objectively reasonable, articulable suspicion that the package contained contraband," *Demoss*, 279 F.3d at 636, for the reasons articulated by Judge Piester. I also find that the Defendant's statements during his interrogation were made voluntarily and are not subject

to suppression, for the reasons stated by Judge Piester.

IT IS ORDERED:

1. The Magistrate Judge's Recommendation (filing 19) is adopted; and

2. Defendant's motion to suppress (filing 10) is denied.

## REPORT AND RECOMMENDATION

PIESTER, United States Magistrate Judge.

The motion to suppress filed by defendant Rodolfo Terriques, filing 10, was heard on January 29, 2002. The scope and issues of defendant's motion were clarified by his counsel during the course of this evidentiary hearing. In this motion, the defendant contends that his Fourth Amendment rights were violated when an overnight U.S. Mail package addressed to "Martin Sanchez" was removed from the regular flow of mail. Specifically, the defendant claims that his overnight mail package was intercepted from the regular stream of mail and detained without any sufficient basis for finding reasonable suspicion or probable cause for this Fourth Amendment "seizure." The defendant claims that any and all evidence derived

---

**1.** As Judge Piester noted, the motion to suppress is based on the argument that the withdrawal of the package from the regular flow of mail is a seizure which was unlawful because postal clerk Leon had no reasonable and articulable suspicion of criminal activity when he picked up the package, and that all subsequently obtained evidence, including the evidence derived through search of the package pursuant to a warrant and the controlled delivery, is inadmissible fruit of the poisonous tree. (Filing 19 at 1. *See also* T. 75:18–22; 129:17–20; 147:7–12.) The other portion of the motion asserts that statements made during interrogation should be suppressed because they were involuntary.

**2.** The majority opinion in *Demoss* held that a Federal Express package was seized for

Fourth Amendment purposes not when it was moved from a conveyor belt but when it was detained for a canine sniff. 279 F.3d at 636 (Bowman & R. Arnold). Though concurring in the result, Chief Judge Hansen opined that detention would not constitute seizure "until the authorities have interfered with a possessory interest in the luggage or mail such that the expectation of timely delivery of the package or luggage has been frustrated." *Id.* at 640 (citations omitted). I need not decide whether the detention for the canine sniff in the case before me was a seizure, because the facts before me establish that the postal inspectors had the objectively reasonable, articulable suspicion that the package contained contraband necessary to validate a seizure.

from this illegal seizure, including the evidence derived through search of the mail package pursuant to a warrant, is fruit of the poisonous tree and inadmissible. *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). In addition, the defendant claims that his statements following arrest and during interrogation by Officer Herrera of the Lincoln, Nebraska Police Department were involuntary and therefore inadmissible. (T, 145:9–148:15).

### FACTS

On August 20, 2001, a package addressed to Martin Sanchez arrived at a United States Postal Service post office located at 1251 South 25th Place, Phoenix, Arizona, identified by the postal service as the Phoenix Air Mail Center (hereinafter "AMC"). (T, 8:12–21; 17:18–21; 21:16–21; Exhibit 1, affidavit ¶ 3). This postal facility is an airport location consisting of one large room through which all overnight mail from the state of Arizona is sorted and forwarded for delivery. (T, 36:9–25). Within this room, the incoming packages are routed to a central area, manually picked up and sorted by the postal clerks, and appropriately placed in one of the many bags hanging on racks within the room, each bag destined for a separate airport. (T, 10:10–11:18; 39:3–18; 71:16–73:6).

On August 20, 2001, Mr. Robert Leon was working as an express mail postal clerk at this facility. Mr. Leon had been raised in Phoenix, Arizona, and had been employed with the postal service in this position and location for six years. (T, 8:12–9:6, 12:11–24, 20:7–21:1). He had no formal training in drug interdiction but, through on-the-job training and his own efforts to gain information from interdiction officers present at the facility over the previous six years, had obtained a working knowledge of the characteristics often associated with packages used in the shipment of illegal drugs by U.S. Express Mail. (T, 12:25–17:17). While he did not consider it one of his actual job responsibilities, over the years Mr. Leon had frequently intercepted suspicious packages. When interdiction officers were present, he would hand them to the officers for their handling. When no interdiction officer was at the scene, he would secure the package and contact law enforcement. (T, 49:15–51:17). Over his six years of work as an express postal clerk, Mr. Leon has intercepted "over a couple hundred" packages containing illegal substances being transported through the U.S. Mail. (T, 16:14–22).

When the defendant's package arrived at the AMC on August 20, 2001, Postal Inspectors Gregory Popp and William Randall were also present in the central sorting area performing an interdiction to intercept packages containing illegal substances within the express mail. (T, 38:5–39:2). Both inspectors were highly trained and experienced in identifying and seizing suspicious mail packages, but unlike Mr. Leon, neither inspector was a long-time resident of Phoenix nor thoroughly familiar with the addresses and locations in the Phoenix area. For this type of information, they relied on Mr. Leon's knowledge of the area. (T, 54:20–56:7, 56:22–57:6, 59:24–60:2, 62:14–63:5, 68:24–71:9).

The defendant's package had been mailed at 12:50 p.m. on August 20, 2001 from the main post office in Phoenix, and in accordance with the post office's standard shipping methods, arrived at the AMC at approximately 4:00 p.m. for sorting and shipment by air to Omaha, Nebraska. The shipment of packages by air to Omaha was scheduled to depart at 7:00 p.m. (T, 39:19–40:14, 43:8–44:9, Exhibit 1, affidavit at ¶ 5). When Mr. Leon picked

up the package from the incoming mail "hamper" to sort it into the correct outgoing air sack, he noticed that the return address indicated it was mailed by a person, but the address listed was on a block he knew contained only businesses in a low income, high crime area of Phoenix. Mr. Leon was very familiar with this area of Phoenix because he had grown up there, his mother still lived there, and he had been in the area the morning of August 20 to bring his child to his mother's home. (T, 17:18–18:8, 20:7–21:6, 31:2–19). Based on his knowledge of that neighborhood, and upon his observation over the six years of his experience, that the majority of express mail is sent by businesses, he believed that the return address affixed to Mr. Terriques' package was fictitious. (T, 22:22–23:12, 24:19–25:5, 33:14–34:23, 43:6–44:9). Mr. Leon also noticed that every unglued seam on the packaged was taped (some double-taped), and that the package was very "solid." The fact that the package had been mailed from the main post office, ten miles from a post office near the locality of the return address, added to his suspicion. The totality of these factors caused Mr. Leon to suspect that the package contained illegal substances. (T, 18:4–20:6, 22:4–21, 25:25–26:8, 52:6–53:14).

Mr. Leon promptly handed the package to Inspector Randall, advising him that the package was "worth taking a look at," and explaining to the inspector that the return address was not for a residence but a business, that it had been mailed a significant distance from the post office in that area of Phoenix, and that this return address was in a high crime area. (T, 41:10–43:12). Inspectors Randall and Popp were aware that those sending narcotics frequently use nonexistent or fictitious addresses in an effort to prevent being identified if the package is intercepted in the mail. (Exhibit 1, affidavit ¶ 10). After handing the package to Inspector Randall,

and providing him with Mr. Leon's perceptions concerning the fictitious nature of the return address, the neighborhood of the address, and the fact that the package was mailed a significant distance from that neighborhood's post office, Mr. Leon had no further involvement in the interdiction and controlled delivery of the package.

Upon receipt, Inspectors Randall and Popp also noted that the package was heavily taped, meaning that every seam of the package was sealed. This fact raised suspicion that the package contained illegal drugs, because drug packages are commonly sealed with tape in an effort to contain any drug odor emitting from the package. (T, 17:1–10, 73:20–25). This factor, along with the information received from Mr. Leon, prompted Inspector Randall to take possession of the package and hold it while he further investigated the origin and circumstances surrounding this package. (T, 58:1–60:22). He contacted the Maricopa Sheriff's Department for assistance in conducting a canine sniff of the package. (T, 60:9–61:25). Soon thereafter, at approximately 5:44 p.m., "Charlie," a dog from the Maricopa County Canine Unit that had been certified to detect the odors of several illegal drugs, "alerted" to the package, indicating the presence of illegal substances. (Exhibit 1, affidavit ¶¶ 7–8).

Based on the information Inspector Randall had obtained, including the indication of a fictitious return address, the origin of the package from a high crime area of Phoenix, and the positive canine alert, the package was not placed in the bag for transport to Omaha on August 20. Instead, Inspector Randall secured the mail package until a search warrant could be obtained. (T, 60:23–62:8). On the evening of August 20, Inspector Randall further investigated the package by driving past the location listed on the return address to

confirm that it was a business address. The following day, through his investigation with the postal employees providing service to that address, he determined that the return address was that of Mariscos Bahia De Lobos, a seafood restaurant, and that the name on the return address, Ramon Alvarado, was not associated with anyone who received mail at this address. (Exhibit 1, affidavit ¶¶ 7-8). Inspector Randall provided the results of his investigation to Inspector Popp, who used this information on August 21 to prepare an affidavit and application for a warrant to search the package. (T, 74:3-76:21, Exhibit 1).

As authorized by the warrant, Inspector Randall carefully opened the bottom of the package on August 21, 2001, finding within it manilla envelopes, wrapped with duct tape, which appeared to contain illegal drugs. (T, 77:17-79:19, 81:25-82:20, Exhibits 2, 3, and 4). The contents were photographed and returned to the package, the package was closed, double bagged with a metal tamper-proof seal, and sent by plane to Omaha, Nebraska for controlled delivery. (T, 82:21-85:13).

Upon arrival in Omaha on August 22, Postal Inspector Clayton Reeves transported the package to the Lincoln, Nebraska address on the package, and delivered it to the defendant Terriques, who identified himself verbally and by photo identification as Martin Sanchez. (T, 91:92:10, 97:8-99:6, 104:20-106:12). The defendant was promptly arrested and taken into the custody of the Lincoln Police Department by Officer Robert Bratt.

Officer Bratt transported the defendant to the station house for questioning, and defendant was placed in an interview room. (T, 149:12-151:6, 151:15-152:3). Because the defendant speaks principally Spanish, a Spanish-speaking investigator, Luis Herrera, advised the defendant in Spanish, both verbally and in writing, of his rights under *Miranda.* Defendant waived these rights, and signed a written waiver. (T, 159:5-14, 161:8-162:2, 166:7-15, 166:24-170:3, 170:25-171:23, Exhibit 6).

With the defendant sitting at the opposite side of a table, Investigator Herrera questioned Mr. Terriques in Spanish concerning the charges against him. At no time during the ninety minute interview (which including several breaks) did the defendant request an attorney, request a break, or revoke his consent. No force, physical intimidation, promises, fear or oppression were used to obtain information from the defendant. He appeared to be of average intelligence, understood the Spanish being spoken, answered questions coherently, and did not appear to be under the influence of any drug or alcohol. (T, 170:17-178:5).

Defendant asserts that the statements made during this interrogation were involuntary and inadmissible. He further claims that his Fourth Amendment rights were violated by the unconstitutional detention, seizure and search of his Express Mail package, and that all evidence obtained as a result of this unlawful search and seizure is inadmissible.

### DISCUSSION

Initially, I must address the issue of standing. The government has challenged whether this defendant has standing to raise any claim that the package was illegally seized and searched. (T, 5:20-6:16). A defendant may not challenge a search or seizure unless he demonstrates that his own constitutional rights have been infringed. *United States v. Caballero-Chavez,* 260 F.3d 863 (8th Cir. 2001). The government contends that the defendant has not admitted or claimed that he owned the package and, at the outset of the hearing, no claim of ownership or con-

trol was offered by the defendant through his counsel. (T, 4:15–22). However, Inspector Reeves, who carried out the controlled delivery of the package, identified the defendant in the courtroom and testified that at the time of delivery, defendant Terriques identified himself as "Martin Sanchez" and provided a photographic identification in support of that claim. (T, 105:3–106:12, 107:10–12, 110:3–12). While the names are different, the evidence establishes that Rodolfo Terriques and Martin Sanchez are the same person. The defendant therefore has standing to challenge the seizure and search of a package addressed to Martin Sanchez.

 To be regarded as a "seizure" of property, there must be "some meaningful interference" with the defendant's interests in that property. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984); *United States v. Demoss*, 279 F.3d 632 (8th Cir.2002). The defendant must have a privacy interest in the contents of the package or a possessory interest in the package itself. *United States v. Place*, 462 U.S. 696, 706, 103 S.Ct. 2637, 2643 n. 6, 77 L.Ed.2d 110 (1983). If law enforcement authorities have reasonable suspicion to believe that a package contains contraband, they may detain it for a reasonable length of time to perform an investigation. *United States v. Van Leeuwen*, 397 U.S. 249, 252–53, 90 S.Ct. 1029, 1032–33, 25 L.Ed.2d 282 (1970). Where the package has been delivered to a

common carrier for delivery, the detention does not even begin to interfere with the owner's possessory interest until it delays delivery of the package beyond the contractually agreed upon time. *Demoss*, 279 F.3d at 638–39 (Hansen, concurring) (citing *United States v. Vasquez*, 213 F.3d 425, 426 (8th Cir.2000) and *United States v. Ward*, 144 F.3d 1024 (7th Cir.1998)).

 The defendant alleges that his Fourth Amendment rights were violated when postal clerk Leon "detained" his Express Mail package, looked at its exterior, and rather than placing it into the Omaha air bag, handed it to the postal inspectors present at the scene. The defendant claims this action removed the package from the normal stream of mail without reasonable and articulable suspicion of criminal activity, and therefore the package was unconstitutionally seized. I find, however, that the act of removing the package and handing it to the inspectors for visual investigation was not a detention of the package and therefore, no Fourth Amendment seizure occurred as a result of this action.

Determining whether a package was "seized" under the Fourth Amendment requires deciding if and when the government's actions interfered with defendant's privacy or possessory interests in any meaningful way. *Demoss*, 279 F.3d at 636–37.[1] When the package has been relin-

---

1. *United States v. Demoss*, 279 F.3d 632 (8th Cir.2002) cites to *United States v. Place*, 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) for its analysis of the Fourth Amendment issues in detaining and seizing mail. The Court in *Place* noted that securing luggage from a traveler at an airport implicates significantly different interests than those involved in detaining mail that the defendant has already relinquished to a third party. *Id.* at 706 n. 6, 103 S.Ct. at 2644. In the former case, not only the luggage, but travelers seeking the return of their luggage, are likely

detained, which impacts both property and liberty interests. "Unlike the dispossession of hand baggage in a passenger's custody, which constitutes a substantial intrusion, the mere detention of mail not in his custody or control amounts to at most a minimal or technical interference with his person or effects, resulting in no personal deprivation at all." *Id.* at 718 n. 5, 103 S.Ct. at 2650 (Brennan, J., concurring) (citing *United States v. Place*, 660 F.2d 44, 52–53 (2d Cir.1981)). In the case of mail or luggage already relinquished for han-

quished to a third party for delivery through the mail, the defendant's "possessory interest" in that package is limited. Having surrendered possession of the package to a carrier, the defendant's possessory interest is only in its timely delivery. *Id.*

The sender's privacy interest in the contents of the package are significant, but while he can reasonably expect that the package will not be opened and searched en route, he cannot reasonably claim that while in the possession of the carrier, the package will not to be handled and its exterior physical attributes observed:

> By entrusting the package to [the United States Postal Service] for delivery ..., the sender virtually *guaranteed* that any characteristic of the package that could be observed by the senses would be so observed. And there was no legitimate expectation that law-enforcement officers would not be among the observers. 'The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities.'

*Demoss,* 279 F.3d at 635 (citing *Jacobsen,* 466 U.S. at 122, 104 S.Ct. at 1652) (emphasis in original). "A 'legitimate' expectation of privacy by definition means more than a subjective expectation of not being discovered." *Jacobsen,* 466 U.S. at 123 n. 22, 104 S.Ct. at 1661 n. 22.

At the Phoenix AMC, all packages were manually picked up by postal clerks for sorting into bags by destination. Although Mr. Leon did not place the defendant's package in the Omaha bag for delivery by air, he held it for only 30 seconds before handing it to the postal inspectors for their visual investigation. (T, 45: 20–23). This event occurred three hours before the scheduled departure of mail destined for Omaha. Mr. Leon's act of briefly removing the package for further examination did not interfere with the defendant's right of privacy in the contents. The contents of defendant's package were not searched until a canine had alerted to the package and a warrant authorizing the search had been issued. See, *Vasquez, supra* (briefly looking at package exterior is not a seizure. Seizure under the Fourth Amendment occurred when the officers removed the package from the stream of mail in response to a dog alert, which provides sufficient probable cause to hold the package).

Nor was the defendant's possessory interest affected by Mr. Leon's act of holding the package. At the time when Mr. Leon and the inspectors were observing the outside of the package, the defendant's only possessory interest was his "contract-based expectation" that the package would timely arrive in Lincoln on August 21, 2001. While this mailed package was in transit, "the only possessory interest at stake ... was the contract-based expectancy that the package would be delivered to the designated address, within some promised or reasonably expected period of time." *LaFrance,* 879 F.2d at 7. (See also, *Quiroz,* 57 F.Supp.2d at 814, and extensive citations therein). When the government's assumed detention of the package for in-

---

dling by a third party, the defendant has only a "limited" possessory interest, (*Demoss,* 279 F.3d at 636–37), often defined as the "contract-based expectation" that the package will be timely delivered. 4 W. LaFave, *Search and Seizure* § 9.7, p. 363 (1996) (citing *United States v. LaFrance,* 879 F.2d 1 (1st Cir.1989)).

See also, *United States v. Harvey,* 961 F.2d 1361 (8th Cir.1992) (luggage moved but passenger's itinerary uninterrupted). Detention of such packages for a reasonable length of time is only minimally intrusive, if at all. *Van Leeuwen,* 397 U.S. at 251, 90 S.Ct. at 1031.

vestigative purposes does not delay the likelihood or probability of its timely delivery, there has been no meaningful interference with the individual's possessory interest in the package. *United States v. Ward,* 144 F.3d 1024, 1033 (7th Cir.1998); *United States v. England,* 971 F.2d 419, 421 (9th Cir.1992); *United States v. Valenzuela–Varela,* 972 F.Supp. 1308, 1311 (D.Mont.1997); *United States v. Pono,* 746 F.Supp. 220, 221 (D.Me.1990).

When Mr. Leon handed the package to the inspectors for further visual investigation, there were three hours remaining before the package was to be loaded onto the Omaha plane. Absent the later positive alert by a canine, any intrusion, if any, caused by the brief visual investigation of this package's exterior by law enforcement would likely not have delayed the package from its scheduled mailing. See, *Demoss,* 279 F.3d at 634–36. The package was not detained or seized for Fourth Amendment purposes by Mr. Leon's act of handing the package to the postal inspectors. *Demoss,* 279 F.3d 632 (no seizure occurs by the brief act of lifted a mail package from a conveyor belt for visual observation by officer); *Vasquez,* 213 F.3d at 426 (officers action in picking up package to examine its exterior is not a detention requiring reasonable, articulable suspicion because, at that point, the officers had not delayed or otherwise interfered with the normal processing of the package).

■■■ The decision by governmental authorities to exert dominion and control over a mailed package for their own purposes constitutes a seizure. *Garmon v. Foust,* 741 F.2d 1069, 1072 (8th Cir.1984). A package in the mail may be detained for

further investigation is there is a reasonable suspicion, based on articulable facts, that it contains contraband. *Van Leeuwen,* 397 U.S. at 252–53, 90 S.Ct. at 1032–33; *United States v. Sundby,* 186 F.3d 873, 875 (8th Cir.1999); *Quiroz,* 57 F.Supp.2d at 813. Thus, a detention of defendant's package sufficient to implicate the Fourth Amendment occurred when the government decided to hold it for a canine sniff. *Demoss,* supra.

> "The determination of whether a government agent's suspicion is constitutionally reasonable is exceedingly fact-specific. We examine the totality of the circumstances arguably supporting a determination of reasonable suspicion, evaluating those circumstances as they would be 'understood by those versed in the field of law enforcement.' "

*Demoss,* 279 F.3d at 636. The temporary detention of mail for investigative purposes is not an unreasonable seizure when authorities have a reasonable suspicion of criminal activity. *Van Leeuwen,* 397 U.S. at 252, 90 S.Ct. at 1032.

■■■ Reasonable suspicion sufficient to detain a mail package exists when, based on the totality of the circumstances, an officer possesses a "particularized and objective basis" for suspecting that the package contains contraband, that is, more than an "inchoate and unparticularized suspicion or 'hunch.' " *United States v. Johnson,* 171 F.3d 601, 603–04 (8th Cir. 1999). Characteristics consistent with innocent use of the mail can, when taken together, can give rise to a reasonable suspicion that a package contains contraband. *Demoss,* 279 F.3d at 636–37.[2] Con-

---

**2.** The postal service has developed a "drug package profile," which targets packages based on certain traits encountered in the vast majority of mailings discovered to contain drugs. These characteristics include: (1)

the size and shape of the mailing; (2) whether the package is taped to seal all openings; (3) whether the mailing labels are handwritten; (4) whether the return address is suspicious (e.g., the return addressee and the return ad-

duct which appears innocent to an untrained observer may be significant to a law enforcement officer familiar with the practices of drug traffickers and the methods they use to avoid detection. *Id.; United States v. Wallraff,* 705 F.2d 980, 988 (8th Cir.1983). Officers are permitted to draw "inferences and deductions that might well elude an untrained person," and these factors may become part of an "Express Mail/Narcotics" profile developed by law enforcement. However, when relying on a "drug profile" to find reasonable suspicion, "the Fourth Amendment requires an officer to explain why the officer's knowledge of particular criminal practices gives special significance to the apparently innocent facts observed." *Johnson,* 171 F.3d at 604.

At the time Inspectors Popp and Randall seized the package, Mr. Leon had provided them with highly credible information concerning the fictitious nature of the return address, and the fact that this address was located in a low income, high

crime area of the city.[3] As explained in the affidavit of Popp, which is based on Inspector Randall's information and assessment, those sending illegal contraband through the mail often use fictitious return addresses so that in the event the drugs in the package are discovered, the identity of the sender remains unknown. In addition, both Inspector Randall and Mr. Leon observed that every seam of the package was either glued or taped, a method used by drug traffickers to avoid the escape of odors through the seams of the mailing container. "Heavy taping of an Express Mail package is 'a circumstance perhaps more suspicious than the others in the' Express Mail/Narcotics profile." *Demoss,* 279 F.3d at 636 (citing *Johnson,* 171 F.3d at 605 n. 2).

The taping of the package, the fictitious return address, and the fact the package was sent from a high crime area, provided sufficient reasonable suspicion to detain the package for further investiga-

dress do not match, or the return address is fictitious); (5) unusual odors coming from the package; (6) whether the city of origin and/or city of destination of the package are common "drug source" locales; and (7) whether there have been repeated mailings involving the same sender and addressee. *U.S. v. Daniel,* 982 F.2d 146, 150 n. 5 (5th Cir.1993); *U.S. v. Lux,* 905 F.2d 1379, 1380 n. 1 (10th Cir. 1990). Further factors discussed in the case law include that the package was sent by overnight mail, that the sender is an individual rather than a business, and that the postage was paid with cash. *United States v. Demoss,* 279 F.3d 632 (8th Cir.2002).

3. Mr. Leon also told the inspectors that the package was not mailed near the location of the return address. Inspector Randall did not testify that this fact influenced his decision to detain the package on the basis of reasonable suspicion. I could foresee that a drug trafficker would choose to mail the package at a distant post office, instead of in a neighborhood where the postal clerks would be more likely to recognize that the return address and name associated with it were

false. However, absent some evidence that this inference is actually relevant to those in law enforcement generally, and that the inspector considered it a relevant factor in this case, I will not include this factor in assessing the sufficiency of reasonable suspicion.

Likewise, the package was sent by overnight mail, by an individual rather than a business, and the postage was paid with cash. (T, 43:24–44:3). Arizona has been listed as a drug source state, *United States v. Beck,* 140 F.3d 1129, 1137 (8th Cir.1998), and Phoenix has been identified as a drug source city. *United States v. Fletcher,* 91 F.3d 48, 50 (8th Cir.1996). These facts are part of the "profile" factors discussed in prior court decisions. (See footnote 3, supra). However, these factors were not discussed as significant in the reasonable suspicion analysis performed by Inspectors Popp or Randall regarding Mr. Terriques' package and are therefore not considered in the court's determination of reasonable suspicion in this case. *United States v. Johnson,* 171 F.3d at 604.

tion. *Demoss*, 279 F.3d at 636–37. See also, *Van Leeuwen*, 397 U.S. at 252, 90 S.Ct. at 1032 (nature and weight of mail packages, the fictitious return address, and the British Columbia license plates of respondent who made the mailings in border town certainly justified detention, without a warrant, while an investigation was made); *United States v. Gill*, 280 F.3d 923 (9th Cir.2002) (detention of package by postal police officer was supported by reasonable suspicion, and thus did not violate the Fourth Amendment; package was excessively wrapped, movements of defendant when he mailed package were furtive, sender and addressee named on package were aliases, and defendant resided at different address than return address); *United States v. Claps*, 818 F.Supp. 1417 (D.Col.1993) (postal inspector had reasonable suspicion that packages with false return address contained illegal items).

 Furthermore, Mr. Leon noticed the suspicious nature of this package at approximately 4:00 p.m., and by 5:44 p.m., a drug dog had "alerted" to the package. At most, the detention of this package was less than two hours. Brevity of a detention is an "important factor" in determining whether it may be justified by reasonable suspicion only. *Place*, 462 U.S. at 709, 103 S.Ct. at 2645; *Demoss*, 279 F.3d at 636–37; *United States v. Dennis*, 115 F.3d 524, 533 (7th Cir.1997). If lengthy, the detention may be unreasonable, intrusive, and unconstitutional absent a showing of probable cause. *Place*, 462 U.S. at 709, 103 S.Ct. at 2645.

 Here, within two hours of detaining the defendant's package, and over an hour before it was scheduled to depart on the Omaha plane, Inspector Randall arranged a canine sniff and presented the package to a certified drug dog. The delay between detaining the package and performing the canine sniff was not unrea-

sonable or a violation of the Fourth Amendment. *United States v. Longbehn*, 898 F.2d 635, 640 (8th Cir.1990) (ninety minute delay of a package voluntarily relinquished to postal authorities in order to present for canine "sniff" is not an unreasonable search and seizure). By 5:44 p.m., a canine trained and certified in drug detection had alerted to the package. Exposing the package to a trained canine to ascertain the presence of narcotics is not a search within the meaning of the Fourth Amendment. *Place*, 462 U.S. at 707, 103 S.Ct. at 2644. Once this occurred and the dog "alerted," the inspectors had probable cause to seize the package and obtain a warrant to search its contents. *Sundby*, 186 F.3d at 876.

Were it not for the positive canine sniff, the defendant's package would likely have departed from Phoenix by 7:00 p.m., bound for Omaha, for delivery to the defendant the next day in Lincoln. Under these facts, there is no basis for finding that the inspectors detained the package for an unreasonable period of time or lacked diligence in carrying out their investigation of defendant's parcel. *Demoss*, 279 F.3d at 636–37. See also, *Van Leeuwen*, supra, (29 hour detention of mail not unreasonable); *United States v. Hillison*, 733 F.2d 692, 696 (9th Cir.1984) (nine hour detention of mail package not unreasonable).

In this case the postal inspectors focused primarily on three factors: the fictitious return address; that it came from a high crime area of the city; and the sealing of each package seam with tape. Active deception is a very reasonable explanation for the fictitious return address, but the remaining factors are consistent with wholly innocent behavior. However, considering the significance placed on the totality of these factors by trained law enforcement, as upheld and endorsed by court decisions, (see analysis supra), these

factors support a finding of reasonable suspicion.

The defendant's motion to suppress argues that no reasonable suspicion existed to support the actions of the postal inspectors in detaining defendant's mail package. Although a warrant was issued, the contents of the package searched, and a controlled delivery made to the defendant, Mr. Terriques does not argue that these actions violated his Fourth Amendment rights. Rather, he claims that absent an initial finding of reasonable suspicion, the facts supporting the warrant and the resulting warrant, the evidence obtained from the package search, and any evidence arising from the controlled delivery must be suppressed as "fruit of the poisonous tree." I find however, that this evidence is not subject to the exclusionary rule.

 With reference to statements made during the interrogation of the defendant following his arrest, the defendant also contends that these statements were involuntary and should therefore be excluded. "The appropriate test for determining the voluntariness of a confession is whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will." *United States v. Meirovitz*, 918 F.2d 1376, 1379 (8th Cir.1990). The court must consider the "conduct of the law enforcement officials and the capacity of the suspect to resist the pressure to confess." *United States v. Pierce*, 152 F.3d 808, 812 (8th Cir.1998). The government has the burden of proving by a preponderance of the evidence that the defendant has voluntary consented to provide information to law enforcement. *United States v. Smith*, 260 F.3d 922, 924 (8th Cir.2001). I find that the government has met this burden.

The individual characteristics of Terriques that are relevant to this issue include his age; his general intelligence and education; the existence of any language barriers; whether he was under the influence of drugs or alcohol; whether he was informed of his *Miranda* rights; and whether he had been previously arrested and was thus aware of the protections that the legal system affords to suspected criminals. The environment of defendant's interrogation is also relevant, specifically, the length of the interrogation; whether the police threatened, physically intimidated, or punished him; whether the police made promises or misrepresentations; and whether he was in custody or under arrest when the consent was given. *Id.; Simmons v. Bowersox*, 235 F.3d 1124, 1133 (8th Cir.2001) (length of detention, the repetitive and prolonged nature of questioning, and the accused's age), (*Pierce*, 152 F.3d at 812) (advised of *Miranda* rights, subjected to physical or emotional coercion, trickery or deceit, prior experience with the criminal justice system), *United States v. Barahona*, 990 F.2d 412, 417 (8th Cir.1993) (defendant's age, general intelligence and education, whether he was under the influence of any mind-altering substance, and his ability to speak and understand the language of the interrogation.)

 The defendant is Spanish speaking. Mr. Terriques had had previous experience with the criminal justice system, and he was also advised of his rights under *Miranda* in Spanish prior to any questioning by Investigator Herrera. He consented both verbally and in writing to the interrogation. Investigator Herrera questioned the defendant in Spanish. The evidence establishes that Mr. Terriques understood the language spoken, was not under the influence of any drugs or alcohol, and was of sufficient age and intelligence to consent to and voluntarily participate in this interrogation. The interrogation lasted only ninety minutes, in-

cluding several breaks taken. During that time, the defendant was not physically or emotionally coerced, he was not tricked or deceived, and he was not promised anything in return for his cooperation. At no time did he request a break, a discontinuance of questioning, or an attorney. Under these facts, I find that his statements to Investigator Herrera were voluntary and are not subject to suppression.

IT THEREFORE HEREBY IS RECOMMENDED to the Hon. Richard G. Kopf, United States Senior District Judge, pursuant to 28 U.S.C. § 636(b)(1)(B), that the defendant's motion to suppress be denied in all respects.

The parties are notified that a failure to object to this recommendation in accordance with the local rules of practice may be held to be a waiver of any right to appeal the district judge's adoption of this recommendation.

Dated March 5, 2002.