# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 00-3013

_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Pablo Caballero-Chavez, | * |
| | * |
| Defendant - Appellant. | * |

_____

No. 00-3173

_____

Appeals from the United States
District Court for the
District of Nebraska.

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff - Appellee, | * |
| | * |
| v. | * |
| | * |
| Jose Luis Meza-Lopez, | * |
| | * |
| Defendant - Appellant. | * |

_____

Submitted:  April 19, 2001

Filed: August 13, 2001

_____

Before BOWMAN, FAGG, and LOKEN, Circuit Judges.

LOKEN, Circuit Judge.

Defendants Pablo Caballero-Chavez and Jose Luis Meza-Lopez entered conditional guilty pleas to conspiring to possess with intent to distribute over five kilograms of cocaine found in a duffel bag hidden in an Omaha hotel room rented for their occupancy by a drug courier. Caballero-Chavez and Meza-Lopez appeal the district court's[1] denial of their motions to suppress the cocaine. Concluding that they abandoned their interests in the hotel room and its contents, we affirm.

**I.**

The following facts are taken from the magistrate judge's thorough Report and Recommendation following a lengthy evidentiary suppression hearing. The defendants do not challenge any of the district court's findings as clearly erroneous.

In May 1999, the defendants hired seventy-year-old Mary Stewart to transport seven kilograms of cocaine from El Paso, Texas to Omaha. Stewart arrived at the Ramada Inn near the Omaha airport on June 1, driving a rented Pontiac Bonneville. She rented Room 123 and called the defendants, who asked her to rent an additional room. Stewart then rented Room 222 under her name, without telling the front desk who would be occupying the room. When the defendants arrived, Stewart gave them the key cards to Room 222 and the keys to the Pontiac. They paid her $6500 in cash.

---

[1]The HONORABLE LYLE E. STROM, United States District Judge for the District of Nebraska, who approved and adopted the Report and Recommendation of the HONORABLE KATHLEEN A. JAUDZEMIS, United States Magistrate Judge for the District of Nebraska.

The next day, officers conducting a broad drug investigation learned from an intercepted telephone call that a male Hispanic staying in Room 222 at the Ramada Inn would be involved in a drug delivery at 8:00 p.m. that evening. When they went to the hotel to investigate, the Ramada's assistant manager told narcotics officers that Stewart had rented Rooms 123 and 222. Officers watched both rooms that afternoon and evening. They saw two Hispanic males through the window of Room 222 but no significant activity at either room. At 8:45 p.m., two Hispanic males drove out of the hotel parking lot in a Pontiac Bonneville with Texas license plates, but no officer had seen the men leaving Room 222. The two men returned at 9:20 p.m. and entered the hotel restaurant.

Shortly thereafter, the officers decided to contact the occupants of the two rooms. They first went to Room 222, but no one responded. They then went to Room 123, identified themselves to Stewart, and told her they were conducting an investigation. Stewart consented to a search of her room, during which the officers saw a large roll of cash in her open purse. After first denying she had rented more than one room, Stewart admitted she had rented Room 222 for two men whose names she did not know. The officers asked Stewart for her consent to search Room 222, telling her that, as the renter, she had authority to consent. Stewart reluctantly consented to a search of Room 222.

The officers advised the assistant manager of Stewart's consent to the search, and he let them into Room 222. They opened two luggage bags that had no identification tags, finding clothing, toiletries, and a cellular phone they could not immediately link to their investigation. They also found a new screwdriver in the night stand drawer. When the assistant manager confirmed that the hotel did not provide screwdrivers, the officers searched for an area accessible by screwdriver, removed a wood panel from under the bathroom sink, and found a duffle bag with no identifying tags. They opened the duffle and found seven kilogram bricks of cocaine.

After finding the drugs and learning that a rental agreement for a Pontiac had been found in Room 123, the officers decided to restore Room 222 to its pre-search condition and speak to the two Hispanic males in the hotel restaurant, suspecting they were the occupants of Room 222 and hoping to obtain a confession. Two Spanish-speaking officers proceeded to the restaurant, where the defendants denied staying at the hotel and said they were there only to meet a lady named Maria. One officer recognized Meza-Lopez's voice from the intercepted phone calls, and one of the defendants produced keys to the rented Pontiac. The defendants agreed to show the officers Maria's room at the hotel. On the way to Room 123, they agreed to follow the officers instead to Room 222. Outside of Room 222, the defendants denied the room was theirs, denied they had ever been in the room, and said they did not care whether the officers searched the room because it was not their room. The officers then entered Room 222 with the defendants, who again denied any claim to the room or to the two luggage bags in the room. When they also denied ownership of the duffel bag hidden under the bathroom sink, the defendants were placed under arrest. This prosecution followed.

In denying defendants' motion to suppress, the district court resolved three issues in the government's favor: first, that Stewart voluntarily consented to the search of Room 222, and the officers reasonably believed she had authority to consent; second, that the defendants had no legitimate expectation of privacy in the area under the bathroom sink and therefore no standing to challenge the warrantless search of the duffel bag; and third, that the defendants abandoned their interest in Room 222 and its contents. Defendants challenge all three rulings on appeal. Given our disposition of the abandonment issue, that is the only issue we need address.

## II.

If the defendants abandoned their interests in Room 222 and its contents, they no longer had legitimate expectations of privacy and are precluded from challenging the

search of the room or the duffel bag on Fourth Amendment grounds. See United States v. Hoey, 983 F.2d 890, 892 (8th Cir. 1993). Whether property has been abandoned is a question of fact we review for clear error. In conducting that review, we "look to the totality of the circumstances, noting in particular two factors: whether the suspect denied ownership of the property and whether he physically relinquished the property." United States v. Liu, 180 F.3d 957, 960 (8th Cir. 1999). Abandonment "is determined on the basis of the objective facts available to the investigating officers, not on the basis of the [defendants'] subjective intent." United States v. Tugwell, 125 F.3d 600, 602 (8th Cir. 1997), cert. denied, 522 U.S. 1061 (1998).

In this case, when questioned in the Ramada restaurant, the defendants denied staying at the hotel. After voluntarily accompanying the officers to Room 222, the defendants denied the room was theirs and denied ever being in the room. When taken into Room 222, they denied that the luggage bags on the floor and a bed were theirs and then denied that the duffle bag under the bathroom sink was theirs. The officers did not find a key card to Room 222 when the defendants voluntarily emptied their pockets, and the bags in the room and under the sink bore no identifying tags. Given the defendants' repeated disclaimers, the district court's finding that they abandoned any interest in Room 222 and its contents is not clearly erroneous. See United States v. Ruiz, 935 F.2d 982, 984 (8th Cir. 1991) (officers may reasonably believe that a suspect's disclaimer of an interest in luggage is an abandonment of his privacy interest, even if they have other evidence of possession). That the abandonment occurred in response to an investigation of illegal drug activity does not render it involuntary. United States v. Segars, 31 F.3d 655, 658 (8th Cir. 1994), cert. denied, 513 U.S. 1099 (1995).

The defendants argue, however, that the cocaine found in the duffel bag must be suppressed because the illegal search of Room 222 and the duffel bag occurred prior to the abandonment of their property interests in the room and its contents. As presented, this argument has two distinct analytical components. First is a fruit-of-the-

poisoned-tree component. The general principle is, "if an illegal search taints a subsequent act of abandonment, evidence acquired after the abandonment ought to be suppressed as the fruit of the unlawful search." United States v. Washington, 146 F.3d 536, 537 (8th Cir. 1998), cert. denied, 121 S. Ct. 575 (2000). The principle as stated assumes that the alleged abandonment preceded seizure of the evidence to be suppressed because that has been the fact pattern in our cases raising this issue -- allegedly illegal police conduct followed by abandonment followed by a contraband-discovering search. But the alleged illegal activity has often been a preliminary search that stopped short of discovery and seizure of the contraband, as in Washington. We noted in Liu that the principle applies "even if the abandonment followed an unlawful search." 180 F.3d at 961. Thus, in this case it does not matter that the allegedly illegal initial search of the duffel bag did not stop short of uncovering the secreted cocaine. The issue is whether the defendants' abandonment was an untainted "voluntary act of will" that left them with no interest justifying suppression of the seized cocaine. Washington, 146 F.3d at 537.

We conclude that the defendants' abandonment was a voluntary act untainted by the prior search of Room 222 and the duffel bag. Earlier that day, narcotics officers had intercepted a call suggesting that an Hispanic male would be involved in a drug delivery in Room 222. They observed two Hispanic males in the room and later saw two Hispanic males drive away from the hotel and return in a Pontiac. They found substantial cash and a rental agreement for the Pontiac in Room 123 after Mary Stewart told them she had rented Room 222 for two men. In these circumstances, as one of the officers testified at the evidentiary hearing, they would have gone to the restaurant and talked to the defendants even if they had not already searched Room 222 and found seven kilograms of cocaine. That hypothetical conversation in the restaurant would have been substantially similar to what actually occurred, since one officer recognized Meza-Lopez's voice from prior wiretapped phone calls. And it is a virtual certainty that the defendants would have responded by abandoning their property interest in Room 222 and its contents, because their actual decision to abandon was made without

-6-

knowledge that the officers had searched Room 222 or found hidden cocaine. Thus, the prior search did not taint the abandonment. Compare United States v. McDonald, 100 F.3d 1320, 1328 (7th Cir. 1996), cert. denied, 520 U.S. 1258 (1997). Indeed, the circumstances are such that the inevitable discovery doctrine reinforces the district court's abandonment finding, as it did in United States v. Chandler, 197 F.3d 1198, 1200-01 (8th Cir. 1999).

The second component of the defendants' argument is based on cases that have labeled abandonment an aspect of Fourth Amendment standing. Defendants cite United States v. Colbert, 474 F.2d 174, 177 (5th Cir. 1973), where the court observed:

> When the time of possession charged and the time of the search coincide or overlap, it is indeed inconsistent for the government to argue the defendant lacked sufficient possession [of contraband] to confer standing to challenge the search but had sufficient possession at the same time for conviction. When, however, the government shows that the property was abandoned before the search, there is no such inconsistency.

But this passage was intended to distinguish the post-abandonment search in Colbert from the Supreme Court's "automatic standing" doctrine adopted in Jones v. United States, 362 U.S. 257 (1960). When Jones was overruled in United States v. Salvucci, 448 U.S. 83 (1980), the above-quoted dicta in Colbert lost its force. See also Rakas v. Illinois, 439 U.S. 128, 140 (1978) ("dispensing with the rubric of standing" in Fourth Amendment cases). Defendants also cite United States v. Morales, 737 F.2d 761, 764 (8th Cir. 1984), which included language suggesting that a suspect's disclaimer of ownership may not be used to deny Fourth Amendment standing to challenge a search when the suspect is charged with unlawful possession of contraband discovered in the search. But Morales simply rejected the government's attempt to argue an abandonment theory for the first time on appeal. Reading the discussion in Morales more broadly, as the defendants urge, would be inconsistent with our later decisions in Washington and Liu. See also United States v. Gomez, 16 F.3d 254, 256-57 (8th Cir. 1994), which read Morales narrowly.

## III.

Having upheld the district court's finding that Caballero-Chavez and Meza-Lopez abandoned their Fourth Amendment interests in Room 222 and the cocaine found in the hidden duffel bag, we need not address the court's alternative grounds for denying their motions to suppress.  The judgment of the district court is affirmed.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.