(No. 95783.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. SHANE PITMAN, Appellant.

*Opinion filed June 17, 2004.*

THOMAS, J., dissenting.

Daniel D. Yuhas, Deputy Defender, and Judith L. Libby, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Lisa Madigan, Attorney General, of Springfield, and Vince Moreth, State's Attorney, of Carlinville (Gary Feinerman, Solicitor General, and Linda D. Woloshin and David H. Iskowich, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE FREEMAN delivered the opinion of the court:

Defendant, Shane Pitman, was indicted in the circuit court of Macoupin County on one count of unlawful manufacture of cannabis, in that he knowingly manufactured more than 500 grams but not more than 2,000

grams of a substance containing cannabis. 720 ILCS 550/ 5(e) (West 1998). Defendant filed a motion to suppress evidence and quash arrest. Defendant moved to suppress, *inter alia*, marijuana plants seized following a search of a farm occupied by defendant. At the close of a hearing, the circuit court granted defendant's motion to suppress. The State brought an interlocutory appeal to the appellate court pursuant to our Rule 604(a)(1) (188 Ill. 2d R. 604(a)(1)). The appellate court, with one justice dissenting, reversed the circuit court's suppression order and remanded the cause to the circuit court for further proceedings. No. 4—01—0620 (unpublished order under Supreme Court Rule 23).

We allowed defendant's petition for leave to appeal (177 Ill. 2d R. 315(a)). We now reverse the judgment of the appellate court, affirm the suppression order of the circuit court, and remand the cause to the circuit court for further proceedings.

## BACKGROUND

The following witnesses testified at the suppression hearing: Alan Bondy, Sherry White, Dale Reels, Ron Lewis, Amy Curtis, and Mary Pitman. The hearing adduced the following pertinent evidence.

Mary Pitman owned a 93-acre farm in Macoupin County, east of the Village of Shipman. Pitman is defendant's mother and Sherry White's aunt; White is defendant's cousin. The farm contained two residences, a farmhouse and a trailer. In July 1999, White lived in the farmhouse; defendant, his girlfriend Amy Curtis, and their two children lived in the trailer.

On Friday, July 16, or Saturday, July 17, 1999, White drove behind a person she believed to be a police officer. She followed him to his home. Unbeknownst to White, the officer was Alan Bondy, the chief of police for the Village of Shipman. White knocked on his front door and they spoke on his porch. According to White:

"I knocked on the door and told him I had a question to ask him, because I was living at a farm and keeping the upkeep, and someone else that was living on the same farm, but down the road, was growing marijuana, and I was wanting to know if I would get into any trouble, or if the person that owned the land would get their farm taken away, and if there was a couple that lived there, and if they would get their kids taken away."

According to White, Bondy responded:

"He said, 'It wouldn't be the Pitman farm out there, would it?' I didn't say nothing, and I could tell he could tell by the look on my face. But *** I said, 'Well, if you know if it's the Pitman farm, why don't you go out there and bust him?' He said he knew Shane Pitman had been growing marijuana for a while, and they was after the bigger guys, that they weren't going to bother him."

At the end of their conversation, according to White: "he told me that I wouldn't get in no trouble, I more or less just took it that that would be it. *** I turned around and left and went home *** [b]ack to the farm." Their entire conversation lasted under a minute.

White testified that she did not describe the location of the plants. She did not give Bondy permission to come onto the premises to search. She did not ask Bondy to have defendant arrested and the plants removed. Between that day and July 20, White was never contacted by anyone from the Illinois State Police. No law enforcement officer ever asked her anything about the plants. She never gave anyone permission to come onto the premises.

Alan Bondy testified as follows. White knocked on his front door and he answered. According to Bondy: "She introduced herself as Sherry White, said she was renting a farm from her Aunt Mary out east of town." Further: "She was concerned over cannabis being grown on the property and was curious whether she would get in trouble or the owner of the property, being her Aunt Mary, would be subject to lose the property because of

the cannabis being grown." Bondy asked White if defendant was growing the marijuana, and White responded "yes." White asked Bondy that if he knew that defendant was growing the marijuana, why did Bondy not go out to the farm and arrest defendant? Bondy told White that the farm was located outside of his jurisdiction.

Further, according to Bondy, White gave him details as to where the marijuana was growing on the premises:

"She said that she had found 13 Dixie cups with starter plants in them, she had found a patch of plants growing behind the barn, behind the house that she lived in. The barn was behind the house that she stayed in, and it was growing behind the barn, and there was another patch across the creek that was growing, on the other side of a hill or somewhere."

White informed Bondy that "Shane was cultivating, he was taking care of the plants, and that's what made her nervous." However, White was somewhat relieved when Bondy offered his opinion that the farm was not in jeopardy because White came forward with this information, and because Mary Pitman had no knowledge of defendant's activity.

Bondy told White that he would have to relay the information to the proper authorities. He told White that "the Drug Task Force would be out there and do an investigation, and they would contact her." The entire conversation lasted "[n]ot more than 5 to 10 minutes."

According to Bondy, the extent of his involvement was that he took a statement from White and relayed that information to the Illinois State Police: "I was given information. I relayed the information on. I jotted the information down on a piece of notebook paper, so that when the information was relayed on I got it correct, and that was inadvertently thrown away." Bondy telephoned the Task Force and left a message. The following week, Dale Reels returned Bondy's call, and Bondy gave Reels

the information. Bondy told Reels that White "had came by the house, she had expressed concern over the plants that were being grown on the property and where they were being grown." Bondy told Reels that White "wanted them [the marijuana plants] removed, and she wanted Shane arrested."

Dale Reels was a patrolman with the Carlinville police department, assigned to the South Central Illinois Drug Task Force, which was a unit of the Illinois State Police. At approximately 1 p.m. on Monday, July, 19, 1999, Officer Reels telephoned Bondy. According to Reels, Bondy told him: "She [White] went to him [Bondy] because she was concerned for the welfare of the farm and concerned for her own welfare, because her cousin, Shane Pitman, was growing cannabis on the farm." Reels had known defendant for a few months because defendant had been a confidential informant for the Drug Task Force. The next day, Tuesday, July 20, 1999, Officer Reels drove to the Pitman farm. During his testimony, Reels was asked whether there was "ample time for you to go obtain a search warrant for the premises on the basis that there is cannabis growing there," to which he answered, "There would have been time, yes."

Officer Reels arrived at the Pitman farm at approximately 2:25 p.m. With him was Macoupin County deputy sheriff Ron Lewis, also assigned to the Drug Task Force. Neither Reels nor Lewis had spoken with White prior to that time. They went to the premises to interview White.

The 93-acre farm was located along a road that ran north and south. The farm was on the west side of the road; the farmhouse faced the road to the east. A driveway off of the road was located on the north side of the house. On one side of the driveway was a sign that read "Private Property" and on the other side a sign that read "No Trespassing." Defendant's trailer was

located "at least a football field's length" north of the house. The trailer had its own driveway off of the road. Reels and Lewis had previously been to defendant's trailer when defendant had been an informant.

The testimony conflicts at this point. According to Reels and Lewis, they both exited the automobile. They went to the front door of the house, knocked, and called, "Anybody home?" Hearing no answer, they went to the back door and knocked. Upon hearing no answer, they walked toward the barn located behind the house.

However, Amy Curtis, defendant's girlfriend, testified that on the afternoon of July 20, 1999, she was driving past the farm when she saw an automobile parked in the driveway. From previous encounters, she recognized the automobile as an unmarked police car. She pulled into the driveway behind the police car and exited her car. She saw one man on the front porch at the door and another sitting in the police car. According to Curtis: "I asked him [the man at the door] 'Can I help you?' And he said 'I am looking for Sherry White.'" Curtis responded that White was at work, but would return home between 3 and 3:30 p.m. Curtis then returned to her car, backed out of the driveway, and drove up the road to her trailer. She saw the police car back out of the driveway and drive away from the house.

Reels and Lewis were each asked whether a woman drove to the house and asked them why they were there. Each responded that he could not remember. Also, neither Reels nor Lewis could remember seeing the "Private Property" and "No Trespassing" signs posted on the driveway.

According to Reels and Lewis, after they received no answer at the back door of the house, they walked away from the house and toward the barn. That building was one of several outbuildings west of the house. The barn was located approximately 50 yards directly behind the

house. The barn had large doors on the east and west sides. The south side of the barn did not have a wall; rather, it had a canopy off of it that covered a feedlot.

The east doors of the barn were open. Reels and Lewis entered the east side of the barn. Once inside, they first saw rolls of carpet and loose straw. The officers next observed marijuana plants growing in the feedlot on the south side of the barn. Some of the plants were planted in five-gallon buckets and some were planted in the ground. These mature plants were at least four feet tall; many were taller than six feet. The plants were interspersed with thick horseweeds that were six to eight feet tall. In addition to these mature plants, Reels and Lewis observed small marijuana plants in Dixie cups, known as starter plants, located outside along the southwest side of the barn.

Reels and Lewis testified that they did not see the marijuana plants from any road, from the driveway, or even at the open doorway on the east side of the barn. Rather, they could see the plants only after they entered the barn.

Reels and Lewis returned to their car and left the farm; they were on the premises for no longer than five minutes. Approximately two hours later, they returned with a third officer, Joe Konnecker. The three officers set up surveillance at several points around the barn. At approximately 5 p.m., defendant appeared and entered the barn. The officers then took defendant into custody and seized the marijuana plants.

According to Reels and Lewis, after defendant was taken into custody, White made her presence known to the officers, invited them into the farmhouse, and made a handwritten statement. In her statement, White stated that defendant had been planting many marijuana plants around the barn and at various locations on the farm. She further stated: "[I] went in town to ask Shipman

Cop what I should do about all pot plants." She stated: "[I] was wondering if Aunt Mary would get her farm taken away or if Amy would get kids taken away or if I would get in any trouble because I lived on farm," and "I was going to pull every plant just to keep the rest of us out of trouble." However, White testified that she wrote the statement only after the officers threatened her with a felony charge.

The officers left defendant at the farm. On December 3, 1999, defendant was indicted on one count of unlawful manufacture of cannabis (720 ILCS 550/5(e) (West 1998)). Defendant was arrested on January 18, 2000.

Defendant moved to quash his arrest and to suppress, *inter alia*, the seized marijuana plants. At the close of the suppression hearing, the trial court granted defendant's motion. The circuit court found that White never consented to the officers' entry onto the property. Accordingly, the circuit court concluded that "the search was improper because it was done as part of a trespass." The circuit court suppressed the marijuana plants.

On appeal, the appellate court, with one justice dissenting, reversed the circuit court's suppression order. The appellate court held that defendant did not have a legitimate expectation of privacy in the barn area because: (1) the area was outside of the curtilage of defendant's trailer and the farmhouse, and (2) the barn was abandoned. Accordingly, the appellate court concluded that the officers' entry into the barn did not violate defendant's constitutional rights. In light of that conclusion, the appellate court did not address whether White consented to the search. No. 4—01—0620 (unpublished order under Supreme Court Rule 23). Justice Cook dissented, stating:

> "I respectfully dissent and would affirm the decision of the trial court. Defendant, who resided on the farm with the owner's permission, clearly had standing to object to a search. I would defer to the trial court's factual decision

that the area in which the search occurred was one in which defendant had a legitimate expectation of privacy. It also seems clear that Sheri [*sic*] White never consented to the July 20 entry onto the property."

The appellate court remanded the cause to the circuit court for further proceedings. We allowed defendant's petition for leave to appeal (177 Ill. 2d R. 315(a)). Additional pertinent facts will be discussed in the context of the issues raised on appeal.

## ANALYSIS

Defendant contends that the appellate court erred in reversing the circuit court's order granting his motion to suppress. In reviewing a circuit court's ruling on a motion to suppress, mixed questions of law and fact are presented. Findings of historical fact made by the circuit court will be upheld on review unless such findings are against the manifest weight of the evidence. This deferential standard of review is grounded in the reality that the circuit court is in a superior position to determine and weigh the credibility of the witnesses, observe the witnesses' demeanor, and resolve conflicts in their testimony. *People v. Gherna*, 203 Ill. 2d 165, 175 (2003); *People v. Sorenson*, 196 Ill. 2d 425, 430-31 (2001). However, a reviewing court remains free to undertake its own assessment of the facts in relation to the issues presented and may draw its own conclusions when deciding what relief should be granted. *Gherna*, 203 Ill. 2d at 175-76, quoting *People v. Crane*, 195 Ill. 2d 42, 51 (2001). Accordingly, we review *de novo* the ultimate question of whether the evidence should be suppressed. *Sorenson*, 196 Ill. 2d at 431.

This standard of review, based on *Ornelas v. United States*, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996), supplants what had been the traditional standard of review for suppression orders. See *Sorenson*, 196 Ill. 2d at 430-31. This court formerly stated that a trial

court's ruling on a motion to suppress would not be disturbed on appeal unless that ruling was manifestly erroneous, but *de novo* review was appropriate where neither the facts nor the credibility of witnesses was questioned. See, *e.g.*, *People v. Mitchell*, 165 Ill. 2d 211, 230 (1995); *People v. Foskey*, 136 Ill. 2d 66, 76 (1990). We note for both bench and bar that in our recent opinions in *People v. Morris*, 209 Ill. 2d 137, 153-54 (2004), and *People v. Ledesma*, 206 Ill. 2d 571, 576 (2003), our reference to *Mitchell* was in error and does not signal a return by this court to the previous standard of review. Therefore, to the extent that the discussion of the standard of review in *Morris* and in *Ledesma* are inconsistent with this opinion, those portions of *Morris* and *Ledesma* are overruled. We reiterate today our adherence to the standard of review set forth in *Ornelas* and adopted by *Sorenson*.

The fourth amendment to the United States Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const., amend. IV; see also *Elkins v. United States*, 364 U.S. 206, 213, 4 L. Ed. 2d 1669, 1675, 80 S. Ct. 1437, 1442 (1960) (observing that the fourth amendment applies to state officials through the fourteenth amendment). Similarly, article I, section 6, of the Illinois Constitution provides that the "people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches [and] seizures." Ill. Const. 1970, art. I, § 6. This court has interpreted the search and seizure provision found in section 6 in a manner that is consistent with the fourth amendment jurisprudence of the United States Supreme Court. *Gherna*, 203 Ill. 2d at 176; *Fink v. Ryan*, 174 Ill. 2d 302, 314 (1996). Warrantless searches are generally considered unreasonable unless they fall within a few specific exceptions. *People v. Galvin*, 127 Ill.

2d 153, 169-70 (1989); accord *Katz v. United States*, 389 U.S. 347, 357, 19 L. Ed. 2d 576, 585, 88 S. Ct. 507, 514 (1967); *People v. Flowers*, 179 Ill. 2d 257, 262 (1997); *United States v. Basinski*, 226 F.3d 829, 833 (7th Cir. 2000).

### I. Reasonable Expectation of Privacy

It is now fundamentally recognized that "the Fourth Amendment protects people, not places." *Katz*, 389 U.S. at 351, 19 L. Ed. 2d at 582, 88 S. Ct. at 511. "But the extent to which the Fourth Amendment protects people may depend upon where those people are." *Minnesota v. Carter*, 525 U.S. 83, 88, 142 L. Ed. 2d 373, 379, 119 S. Ct. 469, 473 (1998). Accordingly, to claim the protection of the fourth amendment, a defendant must demonstrate that he or she personally has an expectation of privacy in the place searched and that his or her expectation is reasonable, *i.e.*, an expectation of privacy "that has 'a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.' " *Carter*, 525 U.S. at 88, 142 L. Ed. 2d at 379, 88 S. Ct. at 472, quoting *Rakas v. Illinois*, 439 U.S. 128, 143 n.12, 58 L. Ed. 2d 387, 401 n.12, 99 S. Ct. 421, 430 n.12 (1978); accord *Smith v. Maryland*, 442 U.S. 735, 740-41, 61 L. Ed. 2d 220, 226-27, 99 S. Ct. 2577, 2580 (1979).

### A. *Curtilage*

Defendant initially contends that the State waived for appellate review the issue of whether the barn was within the curtilage of the farmhouse or the trailer. Defendant posits that the State's sole theory at the suppression hearing was White's implicit consent to the search, and that the State never raised the issue of curtilage. In the appellate court, according to defendant, the State argued that defendant lacked standing to challenge the legality of the search of the barn and the result-

ing seizure of the marijuana plants. The appellate court reasoned: "While the State uses the term 'standing,' the State essentially contends the area searched was not protected against unreasonable searches and seizures because it was outside the curtilage of both defendant's trailer and the farmhouse." Defendant contends that the State waived the curtilage issue for review and the appellate court should not have reversed the suppression order on that basis.

We cannot accept defendant's waiver argument. In the circuit court, the State filed a motion to reconsider the suppression order. The State contended that defendant did not have a legitimate expectation of privacy in the barn because, *inter alia*, he lived a significant distance from the barn "and it was not part of the curtilage of his mobile home." In denying the State's motion to reconsider, the circuit court stated: "Essentially heard the same arguments today that I heard before. Nothing new has been added." We agree with the State that it sufficiently raised the argument that defendant did not have a reasonable expectation of privacy in the barn. Further, in light of the record, it was appropriate for the appellate court to characterize the State's argument as an argument that the searched area did not fall within the curtilage of defendant's residence.

Turning to the merits, a person does not have a legitimate expectation of privacy for actions conducted outside in fields, except in the area immediately surrounding the home. The United States Supreme Court has explained that

"open fields do not provide the setting for those intimate activities that the Amendment is intended to shelter from government interference or surveillance. There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a

home, an office, or commercial structure would not be. It is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields in rural areas. *** For these reasons, the asserted expectation of privacy in open fields is not an expectation that 'society recognizes as reasonable.' " *Oliver v. United States,* 466 U.S. 170, 179, 80 L. Ed. 2d 214, 224-25, 104 S. Ct. 1735, 1741-42 (1984).

Thus, fourth amendment protection extends to a home's curtilage, *i.e.,* the land immediately surrounding and associated with the home. Conversely, no legitimate expectation of privacy attaches to land outside of the home's curtilage, *i.e.,* open fields. *Oliver,* 466 U.S. at 180, 80 L. Ed. 2d at 225, 104 S. Ct. at 1742; *People v. Nielson,* 187 Ill. 2d 271, 280 (1999).

In determining whether a particular area falls within a home's curtilage, a court asks whether the area harbors the intimate activities commonly associated with the sanctity of a person's home and the privacies of life. The extent of the curtilage is determined by factors "that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself." *United States v. Dunn,* 480 U.S. 294, 300, 94 L. Ed. 2d 326, 334, 107 S. Ct. 1134, 1139 (1987); accord *Nielson,* 187 Ill. 2d at 281; *United States v. French,* 291 F.3d 945, 951 (7th Cir. 2002); *United States v. Mooring,* 137 F.3d 595, 596 (8th Cir. 1998). These factors include: (1) the proximity of the area claimed to be the home's curtilage; (2) whether the area is included within an enclosure surrounding the home; (3) the nature of the uses to which the area is put; and (4) the steps taken by the resident to protect the area from observation by people passing by. *Dunn,* 480 U.S. at 301, 94 L. Ed. 2d at 334-35, 107 S. Ct. at 1139.

The appellate court applied these factors as follows:

"As to the first factor, the barn is located between 40 and 60 yards from the farmhouse, the closest residence even under defendant's analysis. Such a substantial

distance does not support an inference that the barn should be treated as an adjunct of the house. See *Dunn*, 480 U.S. at 302, 94 L. Ed. 2d at 335, 107 S. Ct. at 1140. Second, the barn was not within an enclosure surrounding the farmhouse or the trailer. The open nature of the land between the barn and the two residences negates an expectation of privacy in the barn area. See *People v. Lashmett*, 71 Ill. App. 3d 429, 437, 389 N.E.2d 888, 893 (1979).

Third, the barn was no longer used for agricultural purposes and was only used by Mary Pitman to store rolls of carpet. None of the tenants on the farm used the barn area for 'intimate activities of the home.' Last, nothing prohibited observation of the barn area from those standing in the open field. The barn area was not enclosed, the south side of the barn was open, and the doors on the east and west sides were fully open. Mary Pitman testified a 'no trespassing' sign and 'private property' sign were posted at the entrance to the driveway. However, as the Supreme Court has noted it is not generally true that 'no trespassing' signs effectively bar the public from viewing open fields in rural areas. *Oliver*, 466 U.S. at 179, 80 L. Ed. 2d at 224, 104 S. Ct. at 1741.

Accordingly, we find the curtilage of both the trailer and the farmhouse did not extend to the barn area."

We agree with the appellate court's application of the *Dunn* factors to the facts of this case.

The facts presented here pertaining to curtilage are clearly distinguishable from those presented in *People v. Pakula*, 89 Ill. App. 3d 789 (1980), a pre-*Dunn* decision. There, police officers observed from an adjoining lot marijuana plants growing among tomato plants in a fenced, suburban backyard. Applying *Katz*, the *Pakula* court held that the defendant had demonstrated an expectation of privacy that society was prepared to recognize. *Pakula*, 89 Ill. App. 3d at 793. In *People v. Schmidt*, 168 Ill. App. 3d 873 (1988), the appellate court explained that the result in *Pakula* would have been the same if the *Pakula* court had applied the *Dunn* factors. The defendant's expectation of privacy in *Pakula* would

have been supported by evidence that the marijuana plants "were found within the home's enclosure and among the family's food-producing plants. Such circumstances demonstrate that the area in question was clearly an intimate part of the home life of the family and its members." *Schmidt*, 168 Ill. App. 3d at 880 (explaining *Pakula*). In this case, however, the evidence shows that the barn was not within the curtilage of the farmhouse or the trailer.

Based on this conclusion, the State reasons: "Because the barn was not inside the curtilage, it was in 'open fields,' defendant had no reasonable expectation of privacy in that structure, and it is not covered by the fourth amendment." This reasoning lacks merit. Immediately after concluding that the barn was not within the curtilage of the farmhouse or the trailer, the appellate court stated:

> "However, our inquiry does not end there. In discovering the cannabis plants, Reels and Lewis entered the barn itself. An individual may have a protected expectation of privacy in a barn located outside the home's curtilage. See *Dunn*, 480 U.S. at 303-04, 94 L. Ed. 2d at 336-37, 107 S. Ct. at 1141; *United States v. Hoffman*, 677 F. Supp. 589, 596 (1988)."

The appellate court is correct. The Court in *Dunn* held that law enforcement officers, without a warrant, could stand outside of a barn, which was outside of the curtilage of the ranch house, and look inside the barn's open front. *Dunn*, 480 U.S. at 303-04, 94 L. Ed. 2d at 336-37, 107 S. Ct. at 1141. "But *Dunn* did not hold that the police could *enter* the barn itself." (Emphasis in original.) *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001).

The government cannot search a home and its curtilage absent a warrant or some exception to the warrant requirement.

"But if a search occurs outside the home or the home's

curtilage—even if it is on private property—the Fourth Amendment's guarantee applies only if the property owner has a legitimate expectation of privacy in the area. This is because the Supreme Court has rejected a property-line approach to the Fourth Amendment, concluding instead that the government may enter a person's private property (outside of the curtilage) and conduct a warrantless search, unless that individual has a legitimate expectation of privacy in the property searched." *Siebert*, 256 F.3d at 654.

The fourth amendment protects structures other than dwellings, and those structures need not be within the curtilage of the home. *United States v. Santa Maria*, 15 F.3d 879, 882-83 (9th Cir. 1994) (collecting cases). Thus, we consider whether defendant had a legitimate expectation of privacy in the barn.

## B. *Abandonment*

The appellate court answered this question in the negative, reasoning as follows:

"The record contains no facts that defendant utilized the barn itself. With the doors unlocked and wide open as well as an open side, the barn was not secured. The barn was no longer used for agriculture [*sic*] purposes and contained carpet rolls owned by Mary Pitman. The barn was essentially abandoned. Generally, no expectation of privacy exists in property that has been abandoned. [Citation.] Thus, defendant had no expectation of privacy in the barn.

Accordingly, the officers' entry into the barn and search of the barn area did not violate defendant's constitutional rights.

In light of our finding that defendant's constitutional rights were not violated by the police officers' search, we need not address whether White consented to the search."

We disagree with this reasoning.

The controlling principles are settled:

"Abandoned property is not subject to Fourth Amendment protection. [Citations.] This is because Fourth Amendment protection only extends to places and items for which a person has a reasonable expectation of privacy, and no person can have a reasonable expectation of privacy

in an item that he has abandoned. [Citations.] To demonstrate abandonment, the government must establish by a preponderance of the evidence that the defendant's voluntary words or conduct would lead a reasonable person in the searching officer's position to believe that the defendant relinquished his property interests in the item searched or seized. [Citations.] Because this is an objective test, it does not matter whether the defendant harbors a desire to later reclaim an item; we look solely to the external manifestations of his intent as judged by a reasonable person possessing the same knowledge available to the government agents. [Citations.] We look at the totality of the circumstances, but pay particular attention to explicit denials of ownership and to any physical relinquishment of the property. [Citations.]" *Basinski*, 226 F.3d at 836-37. Accord *United States v. Caballero-Chavez*, 260 F.3d 863, 866-67 (8th Cir. 2001); *United States v. Hoey*, 983 F.2d 890, 892-93 (8th Cir. 1993).

The record in the present case is devoid of any evidence that defendant relinquished his expectation of privacy in the barn. The officers saw rolls of carpet in the barn. There was no evidence that defendant physically relinquished the barn. There was no evidence that defendant denied a possessory interest in the barn. These facts certainly do not warrant the inference that defendant intended to abandon the barn. See *People v. Dorney*, 17 Ill. App. 3d 785, 788 (1974). The appellate court's conclusion to the contrary was erroneous.

Thus, the question remains whether defendant had a legitimate expectation of privacy in the barn. We conclude that he had.

Several factors should be examined to determine whether a defendant possesses a reasonable expectation of privacy: (1) ownership of the property searched; (2) whether the defendant was legitimately present in the area searched; (3) whether defendant has a possessory interest in the area or property seized; (4) prior use of the area searched or property seized; (5) the ability to

control or exclude others from the use of the property; and (6) whether the defendant himself had a subjective expectation of privacy in the property. *People v. Johnson*, 114 Ill. 2d 170, 191-92 (1986).

In this case, the circuit court found as follows:

"Testimony indicates that Pitman [defendant] lived on this farm. His mother had given him authority over the farm, that he had power of attorney, or whatever. He lived on the same farm. His mother gave him run of the place.

He was there to look after the place, so this defendant had standing on this property. I don't think there's any question about standing."

As did the United States Supreme Court, we admonish courts against analyzing a legitimate expectation of privacy issue under the rubric of "standing." See *Carter*, 525 U.S. at 87-88, 142 L. Ed. 2d at 379, 119 S. Ct. at 472; *Rakas*, 439 U.S. at 138-40, 58 L. Ed. 2d at 398-99, 99 S. Ct. at 427-29.

The circuit court's findings of fact, with the entire record, support the conclusion that defendant had a legitimate expectation of privacy in the barn. Although defendant did not own the farm, and specifically the barn, defendant clearly had a possessory interest in the entire farm and had the ability to control or exclude others from the use of the property. The record shows that Mary Pitman conferred on defendant the legal authority to take care of the farm. For example, defendant had power of attorney regarding acreage enrolled in the federal Conservation Reserve Program (see generally 16 U.S.C. § 3831 *et seq.* (2000); 7 C.F.R. § 1410.1 *et seq.* (2002)). White testified that defendant helped her to "fix the barn, roofs on the barn." The illegal nature of defendant's activities did not make defendant's expectation of privacy unreasonable. See *United States v. Vega*, 221 F.3d 789, 797 (5th Cir. 2000); *United States v. Fields*, 113 F.3d 313, 321 (2d Cir. 1997). The *Rakas* Court explained that "one who owns or lawfully possesses or

controls property will in all likelihood have a legitimate expectation of privacy by virtue of [the] right to exclude." *Rakas*, 439 U.S. at 143 n.12, 58 L. Ed. 2d at 401 n.12, 99 S. Ct. at 430 n.12.

Further, defendant need not have taken affirmative steps to proclaim his expectation of privacy. The fact that the public could have discovered the plants by trespassing on the farm fails to legitimize an otherwise invalid search. The fact that parts of the barn's interior were visible did not mean that defendant threw open the interior of the barn to general public scrutiny. See *Wilson v. Health & Hospital Corp. of Marion County*, 620 F.2d 1201, 1212 (7th Cir. 1980). A defendant simply must outwardly behave as a typical occupant of the space in which the defendant claims an interest, avoiding anything that might publicly undermine his or her expectation of privacy. *Vega*, 221 F.3d at 797.

We observe the dissent's emphasis "on whether or not the owners and possessors of farm and business structures took sufficient steps to impede access to those structures." 211 Ill. 2d at 535 (Thomas, J., dissenting). However, through authority granted by his mother, defendant had the right to be in the barn, to possess it, and to exclude others from it. These rights are sufficient to establish defendant's reasonable expectation of privacy in the barn and thus to affirm the circuit court's order. See *Rakas*, 439 U.S. at 143 n.12, 58 L. Ed. 2d at 401 n.12, 99 S. Ct. at 430 n.12. We hold that defendant had a legitimate expectation of privacy in the barn.

To be sure, Reels and Lewis appear to have done no more than they might properly have done with a search warrant, which they had several days to obtain. As the Court in *Katz* observed:

"It is apparent that the agents in this case acted with restraint. Yet the inescapable fact is that this restraint was imposed by the agents themselves, not by a judicial officer. They were not required, before commencing the search, to

present their estimate of probable cause for detached scrutiny by a neutral magistrate. They were not compelled, during the conduct of the search itself, to observe precise limits established in advance by a specific court order. Nor were they directed, after the search had been completed, to notify the authorizing magistrate in detail of all that had been seized. In the absence of such safeguards, this Court has never sustained a search upon the sole ground that officers reasonably expected to find evidence of a particular crime and voluntarily confined their activities to the least intrusive means consistent with that end. Searches conducted without warrants have been held unlawful 'notwithstanding facts unquestionably showing probable cause,' [citation], for the Constitution requires 'that the deliberate, impartial judgment of a judicial officer *** be interposed between the citizen and the police ... .' [Citation.] 'Over and again this Court has emphasized that the mandate of the [Fourth] Amendment requires adherence to judicial processes,' [citation] and that searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz*, 389 U.S. at 356-57, 19 L. Ed. 2d at 585, 88 S. Ct. at 514.

Since Reels and Lewis searched defendant's barn without a warrant, the search is deemed unreasonable under the fourth amendment unless the search falls within a specific exception. See *People v. Bailey*, 159 Ill. 2d 498, 503 (1994).

## II. Consent

A well-settled, specific exception to the fourth amendment's warrant requirement is a search conducted pursuant to consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 36 L. Ed. 2d 854, 858, 93 S. Ct. 2041, 2043-44 (1973); *People v. Bull*, 185 Ill. 2d 179, 197 (1998). This consent may be obtained not only from the individual whose property is searched, but also from a third party who possesses common authority over the premises. *Illinois v. Rodriguez*, 497 U.S. 177, 181, 111 L. Ed. 2d 148,

156, 110 S. Ct. 2793, 2797 (1990); *Bull*, 185 Ill. 2d at 197. A court should not infer common authority from the mere property interest a third person has in the property. The authority that justifies third-party consent is not based on the law of property. Rather, such authority is based on mutual use of the property by persons generally having joint access or control for most purposes. Therefore, it is reasonable to recognize that any of the cohabitants has the right to permit the inspection in his or her own right, and that the others have assumed the risk that one of their number might permit a common area to be searched. *United States v. Matlock*, 415 U.S. 164, 171 n.7, 39 L. Ed. 2d 242, 250 n.7, 94 S. Ct. 988, 993 n.7 (1974); *Bull*, 185 Ill. 2d at 197; accord *Basinski*, 226 F.3d at 834. Further, "a warrantless search based on the consent of a person having apparent, though not actual, authority to give such consent is lawful if, at the time of the search, the police reasonably believe that person to have common authority over the place or item to be searched." *Bull*, 185 Ill. 2d at 198, citing *Rodriguez*, 497 U.S. at 186-89, 111 L. Ed. 2d at 160-61, 110 S. Ct. at 2800-01; accord *Basinski*, 226 F.3d at 834.

In the suppression order, the circuit court focused on the issue of whether White consented to the search. We earlier recounted the conflicting testimony on this issue; we note additional evidence. Specifically, Bondy testified that if the farm were located within Shipman: "It would have been a different circumstances [*sic*]. I would have had to handle the case. I probably would have went and looked for myself, because she probably would have given me permission to search at the time, and I would have went on the property and looked." Also during Bondy's testimony, the following colloquy occurred:

"[Defense counsel] Q. All right. Now during this conversation that you had with her [White] on your front porch, did she give you permission to go on the premises?
    A. I never asked.

Q. That wasn't the question. Did she give you permission?

A. No.

Q. Give you permission to go on the premises?

A. No.

Q. Did you ask her for permission to go on the premises?

A. No, I did not.

Q. Did you ask her to sign any form of a consent to give you or other law enforcement people permission to go on the premises?

A. No, I did not.

\* \* \*

[Prosecutor] Q. Due to the fact that she said she wanted Shane arrested and the plants removed, what effect did that have on your request or lack of request for a permission to search form?

A. I felt that she would entertain anyone coming out to talk to her and show them where the plants were without any problem because she was concerned over it and she wanted them removed. So I didn't feel that there would be a problem.

And when the Task Force contacted her, I am [sic] sure that she would grant them permission. She wanted them removed."

Thus, Bondy himself did not believe that White had given him permission to search. Rather, "she probably would have given" Bondy permission to search, or she would have granted the drug task force permission to remove the plants.

The circuit court thoroughly discussed the evidence. Some of that discussion is as follows:

"First, what information the police had is, as I recall, is that White—Bondy told them that White \*\*\* came in, talked about three plots, was concerned about it, her aunt and \*\*\* someone's children, and that Bondy told White he would contact the drug task force.

That's the information the police had. The location of the marijuana Sherry White told Bondy, so they went to the residence to talk to White. She wanted someone to talk

to her, and nowhere, even in Bondy's testimony, is there anything that states: I want you to come out and tear up these plants.

Her main concern, according to Bondy's testimony, is what happens to my aunt? What happens to these kids if they find the marijuana there? So, the police go to the house. Nobody is home. They did not talk to White, never did, until after the search was made.

\* \* \*

If a farmer walked into a police station and said, 'Hey, there's some marijuana on my place. I would like you to come and talk to me about it,' doesn't necessarily mean he's giving them permission to go out there and take it. If he says, 'Go cut it down,' that's a different story.

The only information the police officers had here is that a lady by the name of White came in, told Bondy something, and asked Bondy to have the police contact her. From there on, the rest of the things that the officers did was over and above and beyond the information that they had.

\* \* \*

They had nobody's consent at that time. When they went out there, no one had given them permission. Bondy hadn't given them permission, Sherry White hadn't given them permission, Shane Pitman hadn't given them permission, neither had Shane's mother who owns the property.

Now, what we're asked to do is take the information they had and bootstrap it, and say, well, because she gave us this information, she wanted us to go out there even when she wasn't at home. She wanted us to go out there and pick up that stuff, she wanted us to tear out the plants, and she wanted us to arrest Shane. That's what we're asked to bootstrap out of the little information that the police had.

\* \* \*

They had no permission from anybody. The only permission they had was to contact this lady to see what the heck she really wanted, and they went far and above and beyond that, and it's certainly not the situation where a farmer

comes in and says, 'I got marijuana. Go over there and cut it down.'

No one gave these officers any authority. The only actual authority they had, as I said before, was to contact Ms. White, and once they did more than that, they exceeded their authority, so the Motion to Suppress is allowed. The evidence seized is suppressed."

The State contends, as an additional reason to affirm the appellate court, that White expressly, or at least impliedly, consented to the search of the barn. The State contends that the circuit court's finding to the contrary was against the manifest weight of the evidence.

We uphold the circuit court's finding of no consent. Whether consent has been given is a question of fact to be determined initially in the circuit court. Because a court of review is not in a position to observe witnesses as they testify, it is not within the province of a court of review to assess the credibility of witnesses. When the evidence on the issue of consent is conflicting, this court will uphold the circuit court's finding unless it is clearly unreasonable. *People v. Ledferd*, 38 Ill. 2d 607, 610 (1967); *People v. Peterson*, 17 Ill. 2d 513, 514-15 (1959); see *People v. Bruce*, 185 Ill. App. 3d 356, 368 (1989). After reviewing the evidence presented at the suppression hearing, we cannot say that the circuit court's finding of no consent was unreasonable.

## CONCLUSION

For the foregoing reasons, the judgment of the appellate court is reversed; the order of the circuit court of Macoupin County, which granted defendant's motion to suppress, is affirmed; and the cause is remanded to the circuit court for further proceedings.

*Appellate court judgment reversed;*
*circuit court order affirmed;*
*cause remanded.*

528

JUSTICE THOMAS, dissenting:

I agree with the majority's conclusions that the barn was in the open fields, outside of the curtilage, and that Sherry White did not consent to the search. I disagree, however, with the majority's conclusion that defendant had a reasonable expectation of privacy in the barn. The majority's analysis on this issue is at odds with all of the state and federal cases that have considered searches of barns or outbuildings located on farm property lying outside of the curtilage of a farmhouse. I therefore dissent.

Initially, I note that defendant's motion to suppress did not allege that he had a reasonable expectation of privacy in the barn. Nor did defendant specifically raise this issue in the trial court. Instead, defendant only alleged and argued that (1) police entered the premises without the consent of the owner or tenant; (2) police were trespassing when they came onto the property; and (3) there was no exigent circumstances to justify a warrantless search. The burden of proof is on the defendant at a hearing on a motion to suppress. 725 ILCS 5/114—12(b) (West 2002); *People v. Gipson*, 203 Ill. 2d 298, 306 (2003). Only if the defendant makes out a *prima facie* case that the evidence was obtained through an illegal search does the burden shift to the State to counter with its own evidence. *Gipson*, 203 Ill. 2d at 306-07. Before a defendant can complain of a violation of the fourth amendment, he has to make a showing that he has a reasonable expectation of privacy in the place or thing being searched and that his expectation is reasonable. *Minnesota v. Carter*, 525 U.S. 83, 88, 142 L. Ed. 2d 373, 379, 119 S. Ct. 469, 472 (1998); *Rakas v. Illinois*, 439 U.S. 128, 149, 58 L. Ed. 2d 387, 405, 99 S. Ct. 421, 433 (1978).

Here, defendant did not make out a *prima facie* case showing that he had a reasonable expectation of privacy

in the barn. Indeed, defendant did not even allege that he had a reasonable expectation of privacy in the barn in his motion to suppress. As defendant himself noted in the waiver portion of his brief, "[o]ne of the basic considerations supporting the rule preventing a party from raising issues for the first time on appeal is that '[t]he failure to urge a particular theory before the trial court will often cause the opposing party to refrain from presenting available pertinent rebuttal evidence' which could have a bearing on the disposition in question." See *People v. McAdrian*, 52 Ill. 2d 250, 254 (1972); see also *People v. Holloway*, 86 Ill. 2d 78, 91-92 (1981). This admonition is particularly appropriate here. Defendant's failure to claim that he had a reasonable expectation of privacy in the barn likely impacted the proofs presented at the hearing on the motion to suppress. I would therefore find that, at the very least, any insufficiency in the record should be resolved in favor of the State. I would also find that the State correctly argued in its motion to reconsider that defendant had failed to meet the threshold requirement of showing that he had a legitimate expectation of privacy in the area searched.

On the merits, the majority in effect holds that a person who has a possessory interest in any kind of man-made structure lying outside of the curtilage of a farmhouse also has a reasonable expectation of privacy in the structure. Citing *People v. Johnson*, 114 Ill. 2d 170, 191-92 (1986), the majority notes several factors that should be used to determine whether a defendant possesses a reasonable expectation of privacy: (1) whether the defendant owned the property searched; (2) whether the defendant was legitimately present in the area searched; (3) whether the defendant had a possessory interest in the area searched or the property seized; (4) prior use of the area searched or the property seized; (5) the ability to control or exclude others' use of the

property; and (6) whether the defendant himself had a subjective expectation of privacy in the property. 211 Ill. 2d at 520-21. The majority then concludes that these factors favor a finding that defendant had a legitimate expectation of privacy in the barn.

The problem with the majority's analysis is twofold. First, an evenhanded application of the *Johnson* factors to the present case should lead to the conclusion that defendant had no reasonable expectation of privacy in this particular barn. Second, the factors enunciated in *Johnson* are not meant to be an exhaustive list, nor are they necessarily the most important factors to be considered when determining whether a defendant possesses a reasonable expectation of privacy in a nonresidential structure that lies outside the curtilage of a farmhouse.

The question of whether defendant had a reasonable expectation of privacy in the area searched or the items seized must be resolved in view of the totality of the circumstances of the particular case. *Johnson*, 114 Ill. 2d at 192. The relevant facts and circumstances here, including the *Johnson* factors, show that defendant did not have a reasonable expectation of privacy in the barn. First, it was undisputed that defendant did not own the barn—Mary Pitman owned it. Second, defendant was not present at the barn at the time it was searched and the marijuana plants were discovered. Third, it does appear that defendant had a possessory interest in the area searched. However, a possessory interest, standing alone, is insufficient to establish a reasonable expectation of privacy. *Johnson*, 114 Ill. 2d at 192. Fourth, there is no evidence that defendant made any prior use of the property searched. Arguably, it could be said that defendant incidentally used the barn in connection with his cultivation of the marijuana plants outside the barn. However, an expectation of privacy based on illegal activ-

ity is not one that society is prepared to recognize as legitimate. *Rakas v. Illinois*, 439 U.S. 128, 143 n.12, 58 L. Ed. 2d 387, 401 n.12, 99 S. Ct. 421, 430 n.12 (1978). Fifth, there was no evidence presented that defendant had a right to exclude others from the barn. It was undisputed that defendant lived in a trailer on his mother's farm and that he had power of attorney over the farmland enrolled in the federal conservation program. However, I do not believe that these facts establish that he had a right to exclude others from the barn. Furthermore, even if defendant had both a possessory interest in the property and the right to exclude others, this would not be sufficient in itself to show a reasonable expectation of privacy where the barn was no longer being used for agricultural purposes and was "wide open." As I will explain more fully below, courts that have decided whether a defendant enjoyed a reasonable expectation of privacy in a barn outside the curtilage have looked to whether the barn was being put to a business use on behalf of the farm and whether defendant took any reasonable steps to effect privacy, such as closing and locking the barn doors. Finally, given the wide-open nature of the barn and defendant's lack of use, it is clear defendant himself had no subjective expectation of privacy in the area searched. Defendant was not even effectively using the barn as a cover for his illegal activity, as he grew marijuana outside of the barn.

The majority cites to a footnote from *Rakas* for the proposition that " 'one who owns or lawfully possesses or controls property will in all likelihood have a legitimate expectation of privacy by virtue of [the] right to exclude.' " 211 Ill. 2d at 521-22, quoting *Rakas*, 439 U.S. at 143 n.12, 58 L. Ed. 2d at 401 n.12, 99 S. Ct. at 430 n.12. *Rakas*, however, did not involve a barn lying outside the curtilage of a farmhouse. Instead, it involved the question of whether passengers legitimately occupying a car,

owned by someone else, had a reasonable expectation of privacy. The Court held that they did not. The portion of the footnote from *Rakas* quoted above is best understood by pointing out that it was inserted to explain the holding in *Jones v. United States*, 362 U.S. 257, 4 L. Ed. 2d 697, 80 S. Ct. 725 (1960), which found that a person need only be legitimately on the premises of a residential dwelling to challenge the validity of a search. The search here does not involve a residential dwelling, and a different analysis applies. See, *e.g.*, *United States v. Trickey*, 711 F.2d 56, 58-59 (6th Cir. 1983) (when dealing with nonresidential property, fourth amendment protections are "less significant than they would be in the context of a home").

Most all of the state and federal courts that have considered whether a reasonable expectation of privacy exists in a barn outside the curtilage have looked to whether the barn was still serving the agricultural purposes of the farm or to whether the owner or occupier had taken reasonable steps to effect privacy, such as closing and locking the barn doors. See, *e.g.*, *United States v. Dunn*, 480 U.S. 294, 315, 94 L. Ed. 2d 326, 343-44, 107 S. Ct. 1134, 1146-47 (1987) (Brennan, J., dissenting, joined by Marshall, J.) (the Court assumed for the sake of argument that the defendant had a reasonable expectation of privacy in a barn outside the curtilage because the barn was an essential part of his farming business); *United States v. Pennington*, 287 F.3d 739, 746 (8th Cir. 2002) (upheld search, finding that the defendant had no reasonable expectation of privacy in an underground bunker located outside the curtilage where the structure had a readily visible entranceway and no lock or door impeding access); *Siebert v. Severino*, 256 F.3d 648, 654 (7th Cir. 2001) (owners had a reasonable expectation of privacy in a barn that had doors on it, which were often kept locked); *Trickey*, 711 F.2d at 58 (defendant had a reason-

able expectation of privacy in an outbuilding located on residential property because defendant took steps to protect his privacy by boarding up the windows); *State v. Showalter*, 427 N.W.2d 166, 170 (Iowa 1988) (defendant had reasonable expectation of privacy in barn where it was locked and nailed shut); *People v. Weisenberger*, 183 Colo. 353, 355-56, 516 P.2d 1128, 1129 (1973) (fourth amendment protections applied to a chicken house located on the defendant's farm, where the structure "was being put to an active domestic use. It housed ten to fifteen laying hens and contained necessary feed and water for their maintenance"); *State v. Thompson*, 820 S.W.2d 591 (Mo. App. 1991) (no reasonable expectation of privacy in barn that was unlatched and had been put on the market for sale).

Even though the majority of the United States Supreme Court in *Dunn* accepted as true for the sake of argument the defendant's assertion that the barn there enjoyed fourth amendment protection because it was an essential part of the defendant's farm business, the Court declined to hold that the barn afforded an independent expectation of privacy apart from the farmhouse. In analyzing the point further, however, the dissent in *Dunn* noted the principle that a barn ought to be constitutionally protected if it is being used as part of a farming business. *Dunn*, 480 U.S. at 315, 94 L. Ed. 2d at 343-44, 107 S. Ct. at 1146-47 (Brennan, J., dissenting, joined by Marshall, J.). The dissent also noted that a barn used in farming operations ought to be protected " 'if the owner or occupier takes reasonable steps to effect privacy.' " *Dunn*, 480 U.S. at 315, 94 L. Ed. 2d at 344, 107 S. Ct. at 1146-47 (Brennan, J., dissenting, joined by Marshall, J.), quoting *United States v. Dunn*, 766 F.2d 880, 885 (5th Cir. 1985).

Here, the record is quite clear that the barn was no longer used in farming operations and that neither defendant nor anyone else took any reasonable steps to

protect the privacy of the barn's interior. Officer Lewis testified that the barn had large doors on the east and west sides. The barn doors on the east side were wide open, "at least 10 to 12 feet if not more." The south side of the barn was "open to the air." The barn was not being used to feed and shelter livestock, and there was no farm machinery inside. The only things inside were a couple of old rolls of carpet and loose straw. Officer Reels testified that the barn was between 100 and 200 yards from defendant's trailer. The barn doors on the front and back sides were wide open, with openings of about 20 feet. He also noted that *the south side of the barn did not even have a wall—it was a three-sided building that was open on the south side.* Under these facts, I can only conclude that defendant had no reasonable expectation of privacy in this particular barn. I also note that the totality of the circumstances here clearly distinguish this case from any other reported case where a defendant was found to have a reasonable expectation of privacy in a barn or other farm structure.

Citing *Wilson v. Health & Hospital Corp. of Marion County*, 620 F.2d 1201, 1212 (7th Cir. 1980), the majority states that "[t]he fact that parts of the barn's interior were visible did not mean that defendant threw open the interior of the barn to general public scrutiny." 211 Ill. 2d at 522. By this, the majority means to imply that it is irrelevant to the fourth amendment analysis that the barn doors were open by as much as 20 feet and that the structure was missing an entire wall on the south side. This is a truly remarkable position given the federal and state authority to the contrary as noted above. It is even more remarkable when considering that *Wilson* did not involve a structure on farm property lying outside the curtilage. Rather, it involved a *residence* that had been damaged in a fire. In that case, the door of the residence was not secured by the fire department after it left the

scene. *Wilson* was a civil case. It held only that just because the door was unsecured, leaving unspecified portions of the interior visible, did not "necessitate" the conclusion on summary judgment that an expectation of privacy by the plaintiff was objectively unreasonable. *Wilson*, 620 F.2d at 1212. *Wilson* has no application here, as a person obviously has a reasonable expectation of privacy in his dwelling place regardless of whether he leaves his doors open or unlocked, and the case has nothing to do with a structure lying outside the curtilage of a farmhouse.

Rather than relying on the factually inapposite 1980 decision of the Seventh Circuit in *Wilson*, the majority should have discussed the more relevant and recent decisions of the Seventh Circuit in *Siebert*, of the Eighth Circuit in *Pennington*, and of the Sixth Circuit in *Trickey*. Each of these cases resolved the reasonable expectation of privacy issue by placing the utmost emphasis on whether or not the owners and possessors of farm and business structures took sufficient steps to impede access to those structures. *Siebert*, 256 F.3d at 654; *Pennington*, 287 F.3d at 746; *Trickey*, 711 F.2d at 58.

From these cases, it is also clear that no federal court would hold, as the majority does, that a possessory interest, plus the right to exclude others, automatically creates a reasonable expectation of privacy in a wide-open, three-sided barn lying in open fields. Presumably, the majority would find a reasonable expectation of privacy in any structure, no matter how dilapidated and open to view, as long as the possessor has a right to exclude others. This is a conclusion that finds no precedent in fourth amendment law.

For the foregoing reasons, I would affirm the judgment of the appellate court. I believe it was correct when it determined that defendant had no reasonable expectation of privacy in this particular barn because there were

536

"no facts that defendant utilized the barn itself," the barn "was not secured," its doors were "wide open as well as an open side," and "the barn was no longer used for agricultural purposes." See No. 4—01—0620 (unpublished order under Supreme Court Rule 23). Accordingly, I respectfully dissent.