2020 IL App (1st) 121766-U

No. 1-12-1766

Order filed June 26, 2020

Fifth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 10 CR 433 |
| | ) | |
| CESILIO RAMIREZ, | ) | Honorable |
| | ) | Carol A. Kipperman, |
| Defendant-Appellant. | ) | Judge, Presiding. |
| | ) | |

JUSTICE HALL delivered the judgment of the court.
Presiding Justice Hoffman and Justice Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Defendant's first degree murder conviction is affirmed. The denial of defendant's motion to suppress was proper where defendant was not in custody at the time he invoked his right to counsel. Defendant's 65-year sentence violates the Eighth Amendment under our supreme court's holding in *People v. Buffer*, 2019 IL 122327, and is vacated and the cause remanded for resentencing. The automatic transfer provision of the Illinois Juvenile Court Act of 1987 (705 ILCS 405/5-130 (West 2010)) is not unconstitutional. The mittimus is corrected to reflect one first degree murder conviction.

¶ 2    Following a jury trial, defendant Cesilio Ramirez was convicted of first degree murder in connection with the death of David Jacquez (the victim) and was sentenced to 65 years' imprisonment in the Department of Corrections. Defendant now appeals.

¶ 3    On appeal, defendant contends that: (1) his inculpatory statements to police should have been suppressed; (2) his 65-year sentence violated the Eighth Amendment's prohibition against cruel and unusual punishment; (3) the automatic transfer provision of the Illinois Juvenile Court Act (Juvenile Court Act) (705 ILCS 405/5-130 (West 2010)) is unconstitutional; and (4) the mittimus must be corrected. Defendant does not challenge the jury's guilty verdict. This court initially affirmed defendant's conviction and sentence on appeal. However, the Illinois Supreme Court issued a supervisory order directing this court to vacate our judgment and to reconsider in light of its recent decision in *People v. Buffer*, 2019 IL 122327. After reconsidering, we affirm defendant's conviction but vacate his sentence and remand for further proceedings as explained below.

¶ 4                                    BACKGROUND

¶ 5    By way of background, on October 13, 2009, the victim was shot by an unknown assailant as he and a friend, Steve Olson, walked east on 14th Street, in Cicero. Olson called 911. The police and paramedics arrived and transported the victim to the hospital. The victim was in intensive care and on a ventilator until his death on November 25, 2009. Defendant was subsequently arrested and charged with aggravated battery. After the victim's death, defendant was indicted on multiple counts of murder.

¶ 6    On October 7, 2011, a hearing on defendant's motion to suppress statements was held. At the hearing, the following evidence was presented.

¶ 7     Cicero police detective Manuel Velazquez testified that on October 13, 2009, the 15-year-old defendant was brought to the police station by the Cicero police. Defendant was not handcuffed and, according to the detective, defendant was free to leave the police station. At 9 p.m., in the presence of defendant's father, Carlos Ramirez, and an unidentified youth officer, Detective Velazquez read defendant his *Miranda* rights from a preprinted form. Defendant, Detective Velazquez, and his partner, Detective Al Pineda, signed the form. Defendant invoked his right to counsel. At approximately 9:14 p.m., defendant was released to his father.

¶ 8     Detective Velazquez testified further that on October 14, 2009, at the request of defendant's father, the police transported defendant and his father to the Cicero police station. At 11 p.m., Detective Velazquez read defendant his *Miranda* rights using a preprinted form. The form was signed by Detective Velazquez, Detective Pineda, defendant, and defendant's father. An unidentified youth officer was present but did not sign the form.

¶ 9     According to Detective Velazquez, defendant's father understood English but was more comfortable with Spanish. Although Detective Velazquez spoke Spanish, Detective Pineda served as the translator. Defendant was read his *Miranda* rights and questioned in English.

¶ 10    While he believed defendant attended high school, Detective Velazquez did not recall asking defendant if he attended school. According to the detective, defendant did not request to be alone with his father at any time during questioning on October 14, 2009.

¶ 11    On cross-examination, Detective Velazquez testified that defendant's father never indicated that he had problems understanding the English to Spanish translation. At the October 13, 2009, interview, defendant stated that he understood his right not to speak to the detectives without an attorney present, and he wrote "no" on the form signifying that he would not speak to

the detectives without an attorney present. The October 13, 2009, interview with defendant was then terminated.

¶ 12 Detective Velazquez further testified that he filled out the custodial release of a minor form. The Cicero police department required that a minor be released to a parent or guardian. The detective explained that the bottom of the form was not filled out because there were no charges pending against defendant.

¶ 13 According to Detective Velazquez, the investigation into the October 13, 2009, shooting incident continued into the next day. The detective interviewed a number of witnesses and conducted photo arrays. At approximately 8 p.m., on October 14, 2009, Detective Pineda received a call from Anita Rodriguez, defendant's mother. Ms. Rodriguez told the detective that defendant was at his father's residence and wanted to come to the police station to talk to Detective Velazquez. At approximately the same time, Cicero police officer Rios received a call from defendant's father who informed him that defendant was at his residence and wanted to talk to Detective Velazquez. Officer Rios drove to defendant's father's residence and brought both defendant and his father to the police station.

¶ 14 Detective Velazquez testified that defendant and his father were taken to the second floor interview room, which the detective categorized as a "soft room," meaning that the room was unlocked. Defendant was not handcuffed. Also present were Detective Pineda and Detective Wojtowicz, the youth officer. Detective Velazquez read defendant his *Miranda* rights. After each right was read to him, defendant stated that he understood the right and initialed it on the preprinted form. When asked if he was willing to speak to the detective without an attorney present,

defendant wrote "yes" and initialed it. Defendant signed the form as did Detective Velazquez, Detective Pineda, and defendant's father.

¶ 15    Detective Velazquez testified that following the signing of the form, defendant was questioned for approximately 30 minutes. The detectives then left the room, leaving defendant and his father alone in the unlocked room. Detective Velazquez contacted the felony review unit of the State's Attorney's office. Defendant was placed under arrest at 4 a.m. on October 15, 2009.

¶ 16    On redirect examination, Detective Velazquez testified that defendant was booked at approximately 4 a.m. on October 15, 2009, after the charges against him were approved. Between the defendant's release on October 13, 2009, and his return to the police station on October 14, 2009, Detective Velazquez spoke to defendant's mother, and Detective Pineda spoke to defendant's father. Detective Velazquez told defendant's mother that if defendant wanted to talk to him, the detective had more questions for him based on the continuing investigation into the October 13, 2009, shooting incident.

¶ 17    The trial court denied the motion to suppress defendant's statement to the detectives. The court found that Detective Velazquez was a credible witness. The court further found that while the detectives contacted defendant's parents about additional questions for defendant, the court determined that defendant, through his parents and their separate calls to police, had initiated or reinitiated contact with the police. The court noted that there was credible testimony that defendant's father was present at both interviews, even though his signature did not appear on the October 13, 2009, preprinted *Miranda* rights form. Based on the totality of the circumstances, the court found that defendant's statement was voluntary.

¶ 18    A summary of the trial evidence is set forth below.

¶ 19    On the morning of October 13, 2009, the victim and Olson were walking east on 14th Street on their way to visit a friend of Olson's. The victim was wearing a gold jacket. A green truck turned from 49th Court and proceeded east on 14th Street. As the truck pulled next to the defendant and Olson, Olson saw a female passenger sitting in the back seat. The female passenger stared at them as the truck drove past them and continued to stare at them. Just before turning north on 49th Avenue, the truck stopped, and the female passenger made a hand gesture outside the window. Olson believed the hand gesture was a gang sign. As the victim and Olson crossed the street, Olson noticed an individual in a red hoodie standing 15 feet from the intersection of 14th Street and 49th Avenue. After crossing the intersection of 14th Street and 49th Avenue, the victim and Olson continued walking for five or six feet when Olson heard two or three gunshots. He and the victim began to run; Olson ran left into a gangway, while the victim ran straight ahead. After waiting 15 to 20 seconds, Olson looked out but did not see the victim. The gunshots had stopped, and Olson began walking east down 14th Street to locate the victim. When Olson reached 14th Street and Cicero Avenue, he looked north and saw the victim on the ground. Olson was unable to identify the shooter or any of the individuals in the green truck.

¶ 20    According to the testimony of State's witnesses Rita Quijano, Maria "Nancy" Cortez and Rogelio Castaneda, Nancy's son, on October 13, 2009, defendant, Quijano and Castaneda were passengers in a green Suburban truck (SUV) driven by Cortez. As the SUV passed the victim and Olson, Quijano flashed the La Raza gang sign out the window because the victim was wearing a gold jacket, the color worn by a rival street gang. After turning on 49th Avenue, defendant asked Cortez to stop and let him out of the SUV, telling her that he was going to help his father paint their house. Quijano saw defendant place a handgun in his pants. Defendant and Castaneda exited

the SUV. Defendant was wearing a red hoodie and carried a black bandana, which he pulled around his face. After pulling out the handgun, defendant crossed the street. Castaneda saw defendant raise his arm holding the gun and aim it at the victim, whose back was to him. The victim turned and began to run. Castaneda heard the gunshots but did not see defendant shoot the victim.

¶ 21    After the gunshots, Castaneda ran to his house located on 49th Avenue. Defendant arrived, but Castaneda refused to let him in the house because defendant had shot at someone. After defendant told him he had disposed of the gun, Castaneda let defendant into the house. Defendant went to the bedroom of Cortez's daughter, Vanessa, who was his girlfriend. When defendant came out of the room, he was no longer wearing the red hoodie. When Cortez and Quijano arrived home, Quijano asked defendant what happened. Defendant responded by pointing his hand like a gun to his neck.

¶ 22    Detective Pineda testified that on October 13, 2009, he worked as a detective for the Cicero police department. Witnesses described a green SUV leaving the scene of the October 13, 2009, shooting. Following a traffic stop of the green SUV, defendant and the other occupants of the green SUV were brought to the Cicero police station and questioned separately. Detectives Pineda and Velazquez spoke briefly with defendant with defendant's father present. Defendant then left the police station with his father.

¶ 23    On October 14, 2009, at approximately 1 p.m., Detective Pineda contacted defendant's father asking the whereabouts of defendant because the police had more questions for him. Defendant's father did not know where defendant was, but thought that he was staying with his mother. In the evening hours of October 14, 2009, defendant's father contacted the Cicero police

station and stated that defendant wished to come to the station and speak to the police. Defendant's father requested that the police pick both he and defendant up at his residence in Cicero.

¶ 24    Detective Velazquez testified that during the October 14, 2009, interview, defendant stated that he was a member of the La Raza street gang. Three weeks prior to October 13, 2009, defendant was shot by a member of the Latin Angels street gang; the individual who shot him was wearing a gold jacket. On October 13, 2009, Quijana, Castaneda and defendant were passengers in Cortez's SUV. As the SUV proceeded eastbound on 14th Street, defendant spotted two men and he saw that one was wearing a gold jacket. Defendant told Cortez to stop so he could go to Soto, a store on the corner of 14th Street and 49th Avenue. Defendant exited the SUV and started walking toward Soto's. The man in the gold jacket was "mad mugging" defendant, meaning he was looking angrily at defendant. After getting within three to five feet close to the man in the gold jacket, defendant shot him three times. Defendant explained that he was trying to scare the man and that he wanted the man to feel what it was like to get shot. Defendant stated that he was wearing a red-hooded sweatshirt and jeans.

¶ 25    Assistant State's Attorney (ASA) Jennifer Hamelly testified that at 10 p.m. on October 14, 2009, she received a call from the Cicero police regarding a shooting on October 13, 2009. She was informed that there were witnesses that the police wanted her to interview and who wished to speak to her. She was also informed that the police had someone in custody. ASA Hamelly interviewed defendant at 1:25 a.m. on October 15, 2009. She introduced herself to defendant and explained to him that she did not represent him. She also advised defendant of his *Miranda* rights. Also present were Detectives Velazquez and Pineda, defendant's father, and a youth officer.

¶ 26    While Detective Pineda translated for defendant's father, defendant told ASA Hamelly that three weeks prior to October 13, 2009, he was shot by a man who he believed to be a rival gang member. On October 13, 2009, he saw the same man wearing a gold jacket and walking on 14th Street with another man who was wearing a black ski mask over his face. As defendant approached, the man in the gold jacket began "mad mugging" defendant. Defendant kept walking towards the man. When defendant was about seven or eight feet away, the man turned away from him. The man in the ski mask ran as defendant fired three shots at the man in the gold jacket. Defendant did not know if the shots hit the man.

¶ 27    Defendant further stated that he was wearing a red hoodie but discarded it prior to arriving at Cortez's house. He did not mention that he wore a black bandana. Defendant hid the gun in a black and gray shoebox in Vanessa's room. According to defendant, he did not intend to kill the man. He just wanted him to experience what it felt like to be shot.

¶ 28    According to ASA Hamelly, when she arrived at the Cicero police station at 10:45 p.m. on October 14, 2009, defendant was already in custody. She acknowledged that defendant was sitting with his father in an unlocked interview room and was not handcuffed. Defendant refused ASA Hamelly's request to sign a written confession.

¶ 29    The autopsy established that the victim died from a blood infection due to a gunshot wound to his back. At the scene of the shooting, the police recovered five empty casings. From Vanessa's room the police recovered a .380 caliber Speer handgun; Speer manufactured Hi-Point weapons. The handgun was in a shoebox which also contained a black bandana. Expert testimony established that the five casings found at the scene came from a Hi-Point firearm and that the bullet found in the victim's body came from a Hi-Point firearm.

¶ 30    After the State rested its case, the defense called Detective Pineda, who testified that when defendant and his father arrived at the Cicero police station late in the evening on October 14, 2009, defendant was not in custody.  Nor was defendant in custody at 11:05 p.m. when he and Detective Velazquez questioned defendant.  Detective Pineda identified a Cicero Police lockup form for defendant, dated October 14, 2009, at 22:15 hours.  On the form, the lockup facility was shown as the Cicero lockup and C133 cell number.  Defendant's height and weight were also indicated on the form.  Detective Pineda acknowledged that it was not standard practice to document a witness's height and weight.

¶ 31    On cross-examination, Detective Pineda maintained that defendant was not in the Cicero police station lockup at 22:15 hours (10:15 p.m.) on October 14, 2009.  The time on the lockup form indicated the time that defendant arrived at the police station. The remainder of the information was filled in after defendant made a statement about his involvement in the shooting and was placed under arrest. The lockup form also set forth the charges that were approved by ASA Hamelly at 4:36 a.m. on October 15, 2009.

¶ 32    After being admonished by the trial court, defendant exercised his right not to testify.

¶ 33    The jury found defendant guilty of first degree murder, and further that defendant personally fired the gun that killed the victim.  Defendant's motion for a new trial was denied.

¶ 34    At the sentencing hearing, in aggravation, the State presented the testimony of the victim's mother, two of the victim's other relatives, and Olson.  According to the family witnesses' testimony, the victim had been a wonderful uncle to his nieces and nephews, and they explained how hard it was to watch the victim die a slow and painful death from the shooting.  Olson testified about his friendship with the victim, and how helpful the victim was to his family and friends.

According to the probation department investigative report, defendant's prior criminal history included curfew violations, breaches of the peace, cannabis possession and disobeying a police officer. When arrested in connection with the present offense, defendant was on probation for two aggravated batteries. As a condition of his probation, he was not to be involved in any gang activity. The State requested that the trial court sentence defendant to a term of natural life imprisonment.

¶ 35   In mitigation, defense counsel pointed out that the defendant was only 15 years old at the time of the shooting. Defendant admitted his guilt in the two aggravated battery cases. From the time he was placed on probation, May 2009, until the shooting in October 2009, there was no indication that defendant received any of the corrective services he should have been receiving. Defendant attended one year at Morton Grove High School and attended Hillside Academy for a few weeks prior to his arrest. While in juvenile detention, defendant attended school. However, his ability to read and write was poor. Defense counsel also pointed out that defendant's parents had relocated to Texas, and neither of them was present for defendant's trial. While there were no reports of physical or emotional abuse or drug or alcohol abuse in the home, defendant reported that his father was always working, and his mother was busy. His parents maintained separate residences; as a result, he had little parental supervision. His older brother was a member of the La Raza street gang. Defense counsel requested that the trial court impose the minimum sentence of 20 years for murder and 25 years for the minimum firearm enhancement penalty applicable in this case.

¶ 36   The trial court reviewed the statutory mitigation factors but determined that none of those factors was present. In aggravation, the trial court considered the defendant's prior history of

delinquency and that the sentence of imprisonment was necessary to deter others from committing the same crime. The trial court then stated as follows:

"Basically taking a look at the factors in mitigation and in aggravation, the Court would find that the one mitigating factor which the attorney mentioned which is not listed here is his young age, that he was 15 at the time this offense was committed.

On the other hand, when I consider not only the murder which occurred here but the unusual circumstances of the victim's survival under horrible conditions for the two months before he died, when I consider the love of his family and their loss in this case, when I consider the gang activity here, I put that all together, the Court would find that the minimum sentence in this case is not the appropriate sentence even given his youthful age at the time that he committed it. Taking into account possibly that - - the possibility of rehabilitation and again considering his age, on the other hand, considering a deterrent to the public that people cannot just go around shooting people willy-nilly because they are in a gang, for whatever reason they feel they have to shoot somebody and kill them, and for the protection of the public from these types of crimes, the Court feels that the sentence of 65 years would be appropriate and that will be the sentence."

¶ 37    Defendant's motion for reconsideration of his sentence was denied. This appeal followed.

¶ 38                                            ANALYSIS

¶ 39                                    1. Motion to Suppress

¶ 40    Defendant contends that the trial court erred when it denied his motion to suppress his statement to police. He points out that he had invoked his right to counsel during the October 13, 2009, interview. By questioning him on October 14, 2009, without an attorney present for him,

defendant maintains that the Cicero police violated the rule set forth in *Edwards v. Arizona*, 451 U.S. 477 (1981). The State responds that defendant was not in custody when he was re-interrogated on October 14, 2009, and that even if he was in custody, the trial court found that defendant reinitiated contact with the police. Finally, the State submits that even if defendant's oral statement should have been suppressed, the error was harmless. See *Arizona v. Fulminante*, 499 U.S. 279 (1991) (admission of an involuntary confession is subject to the harmless error rule).

¶ 41 In reviewing a trial court's ruling on a motion to suppress, the court is presented with a mixed question of law and fact. *People v. Pittman*, 211 Ill. 2d 502, 512 (2004). The trial court's findings of fact will be upheld unless they are against the manifest weight of the evidence. *Pittman*, 211 Ill. 2d at 512. However, the reviewing court may undertake its own assessment of the facts in relation to the issues and may draw its own conclusions in deciding what relief should be granted. *Pittman*, 211 Ill. 2d at 512. The ultimate question of whether the evidence should be suppressed is reviewed *de novo*. *Pittman*, 211 Ill. 2d at 512. Our review includes not only the evidence presented at the motion to suppress hearing, but also the evidence presented at trial. *People v. DeLuna*, 334 Ill. App. 3d 1, 11 (2002).

¶ 42 In *Edwards*, the United States Supreme Court held that when an accused invokes his right to counsel during a custodial interrogation, he may not be further interrogated in the absence of counsel unless "the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 485. In order for the rule in *Edwards* to apply, the defendant must be in custody when he is interrogated. "In every case involving *Edwards*, the courts must determine whether the suspect was in custody when he requested counsel and when he later made the statements he seeks to suppress." *Maryland v. Shatzer*, 559 U.S. 98, 111 (2010).

For *Edwards* to apply in this case, defendant must have been in custody on both October 13 and October 14, 2009.

¶ 43    The parties have concentrated their arguments on whether defendant was in custody on October 14, 2009, when he was interrogated by the detectives and made the inculpatory statement. Nonetheless, our examination of the record reveals that defendant was not in custody on October 13, 2009, and therefore, the fact that defendant invoked his right to an attorney does not implicate the rule in *Edwards*.

¶ 44    Defendant did not make a statement when he was questioned by Cicero police on October 13, 2009. Nonetheless, we find our supreme court's discussion in *People v. Slater*, 228 Ill. 2d 137 (2008), of the relevant factors in determining whether a statement was made in a custodial setting instructive as to whether defendant was in custody on October 13, 2009. The factors include "(1) the location, time, length, mood, and mode of the questioning; (2) the number of police officers present during the interrogation; (3) the presence or absence of family and friends of the individual; (4) any indicia of a formal arrest procedure, such as the show of weapons or force, physical restraint, booking or fingerprinting; (5) the manner by which the individual arrived at the place of questioning; and (6) the age, intelligence, and mental makeup of the accused." *Slater*, 228 Ill. 2d at 150.

¶ 45    The reviewing court examines and weighs the various factors, and then makes an objective determination as to whether under the facts presented, " 'a reasonable person, innocent of any crime' would have believed that he or she could terminate the encounter and was free to leave." *Slater*, 228 Ill. 2d at 150, (quoting *People v. Bragg*, 209 Ill. 2d 492, 506 (2003)). We review the facts in this case in order to make that objective determination.

¶ 46    The record reveals that the October 13, 2009, questioning of defendant took place around 9 p.m. in a "soft room," meaning that it was unlocked.[1]  Detectives Velazquez and Pineda were present as was defendant's father and a youth officer.[2]  Defendant was not handcuffed or otherwise physically restrained.  There is no indication that the detectives displayed their weapons.  The interview lasted approximately 14 minutes and was terminated when defendant invoked his right to counsel.

¶ 47    The fact that defendant was given his *Miranda* rights does not establish that he was in custody on October 13, 2009.  "A custodial situation cannot be created by the mere giving of *Miranda* warnings."  *People v. McDaniel*, 249 Ill. App. 3d 621, 633 (1993).  While the defendant was not expressly told he was free to leave the police station, when defendant invoked his right to counsel, the interview was terminated.  Finally, the Cicero police department required that defendant be released to the custody of his father only because of his status as a minor.

¶ 48    Having considered the relevant circumstances, we determine that defendant was not in custody when he was questioned by the detectives on October 13, 2009.  Because defendant was not in custody on October 13, 2009, the rule in *Edwards* does not apply in this case.  Therefore, we need not address whether defendant was in custody when he was questioned by police on October 14, 2009, or the State's argument that any error in denying the motion to suppress was harmless.  We conclude that the denial of defendant's motion to suppress his statement was proper.

¶ 49                                    II.  Sentencing

---

[1] Detective Velazquez testified that on October 14, 2009, the interview with defendant took place in the same room as the October 13, 2009, interview.

[2] Defendant's father's signature did not appear on the October 13, 2009, *Miranda* form. However, at the hearing on the motion to suppress, Detective Velazquez testified that defendant's father was present, and the trial court found Detective Velazquez to be a credible witness.

¶ 50    Defendant contends that his 65-year sentence violates the Eighth Amendment's prohibition against cruel and unusual punishment. U.S. Const. amend. VIII. Defendant relies on the Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012). Defendant argues that *Miller* prohibits the imposition of a lengthy prison sentence on a juvenile without considering the juvenile's age or other youthful factors.

¶ 51    On March 13, 2015, this court affirmed defendant's 65-year sentence, finding that the trial court did not impose a sentence of life imprisonment without parole, that the sentence was within the statutory limits and was not the maximum the court could have imposed. We concluded that *Miller* was not applicable in this case as the court did not impose the most severe penalty available in this State. *People v. Ramirez*, 2015 IL App (1st) 121766-U, ¶ 55.

¶ 52    Subsequent to our initial decision, our supreme court found that a sentence of more than 40 years, imposed on a juvenile offender, constitutes a *de facto* life sentence (*People v. Buffer*, 2019 IL 122327, ¶¶ 40-41); and it ordered us to vacate our judgment in *Ramirez* (*People v. Ramirez*, No. 119284 (March 25, 2020)). Specifically, the supreme court's supervisory order directed this court "to consider the effect of [the supreme court's] opinion in *People v. Buffer*, 2019 IL 122327, on the issue of whether defendant's sentence constitutes a *de facto* life sentence in violation of the Eighth Amendment and *Miller v. Alabama*, 567 U.S. 460 (2012) and determine if a different result is warranted." *Ramirez*, No. 119284 (March 25, 2020). On May 18, 2020, we vacated our prior judgment, and we now reconsider.

¶ 53    The Eighth Amendment prohibits, inter alia, the imposition of cruel and unusual punishment, which includes excessive sanctions. *Roper v. Simmons*, 543 U.S. 551, 560 (2005). In *Miller v. Alabama*, the Supreme Court held that a sentence of "mandatory life without parole for

those under the age of 18 at the time of their crimes" is a violation of this prohibition. *Miller*, 567 U.S at 465. In *People v. Holman*, 2017 IL 120655, ¶ 40, our supreme court expanded *Miller* protection to "discretionary sentences of life without parole for juvenile defendants."

¶ 54    In *Buffer*, 2019 IL 122327, ¶ 27, our supreme court clarified what constituted a life sentence for a juvenile offender. The *Buffer* court found that, for a juvenile, a *de facto* life sentence was a sentence over 40 years. *Buffer*, 2019 IL 122327, ¶¶ 40-41.

¶ 55    Additionally, when defendant was sentenced, a firearm enhancement was mandatory. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2008). However, effective in 2016, the legislature specifically added a provision, so that firearm enhancements were no longer mandatory for juvenile defendants. Pub. Act 99-69, § 10 (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105(b)); Pub. Act 99-258, § 15 (eff. Jan. 1, 2016) (same).

¶ 56    In the present case, defendant was a 15-year old juvenile at the time he committed the offense and received a 65-year term of imprisonment, which is a *de facto* life sentence under *Buffer*. This sentence included a then-mandatory firearm enhancement term of 25 years. As a juvenile defendant when the offense was committed, there is no question that the provisions of *Miller* apply retroactively to him (*Montgomery v. Louisiana,* 577 U.S. __, ___, 136 S. Ct. 718, 736 (2016)), and that he is entitled to a sentencing hearing and sentence which take the *Miller* factors into account. *Holman*, 2017 IL 120655, ¶ 46.

¶ 57    Our supreme court has found that, under *Miller*, a juvenile defendant, such as defendant, may be sentenced to a *de facto* life sentence "only if the trial court determines that the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.

¶ 58     Our supreme court has further found that, before sentencing a juvenile to a *de facto* life sentence, the trial court must consider the defendant's youth and its attendant characteristics, which include: "(1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." *Holman*, 2017 IL 120655, ¶ 46.  In the case at bar, there is no evidence that the trial court considered these factors, although the court did comment on defendant's age at sentencing as a mitigating factor.

¶ 59     Accordingly, we must conclude that defendant's 65-year sentence violates the Eighth Amendment, and we vacate that sentence as unconstitutional.

¶ 60     We therefore remand this matter for a new sentencing hearing, and defendant shall be entitled on remand to be sentenced under the scheme prescribed by section 5-4.5-105 of the Unified Code of Corrections (735 ILCS 5/5-4.5-105 (West 2016)).  See *Buffer*, 2019 IL 1122327, ¶ 47.

¶ 61                              III. Mandatory Transfer Provision

¶ 62     Defendant further contends that the mandatory transfer provision of the Juvenile Court Act, automatically transferring certain minors from the jurisdiction of the juvenile court to the adult criminal court, is constitutionally invalid.  In its supervisory order, our supreme court instructed us to reconsider only the portion of our opinion concerning defendant's *Miller* claim.  Thus, we merely reiterate below what we found regarding defendant's claim.

¶ 63    The automatic juvenile transfer provision provides, in relevant part, that:

"(1)(a) The definition of delinquent minor under Section 5-120 of this Article shall not apply to a minor who at the time of an offense was at least 16 years of age and who is charged with:  (i) first degree murder [.]

****

These charges and all other charges arising out of the same incident shall be prosecuted under the criminal laws of this State."  705 ILCS 405/5-130 (West Supp. 2015).

At the time of the offense in question, the provision provided, in relevant part, that:

"(1)(a) The definition of delinquent minor under Section 5-120 of this Article shall not apply to any minor who at the time of an offense was at least 15 years of age and who is charged with first degree murder[.]

****

These charges and all other charges arising out of the same incident shall be prosecuted under the criminal laws of this State."  705 ILCS 405/5-130 (West 2010).

¶ 64    The key difference between the two provisions is that the former provision applied to 15-year-old minors, whereas the current provision applies only to minors who are 16 years or older. Here, the defendant was 15 years old at the time of the offense.  However, the change in age within the statutory provision has no bearing on our case because the change has been held not to be retroactively applied. *People v. Hunter*, 2017 IL 121306, ¶ 43.

¶ 65    Additionally, our supreme court considered the same arguments raised by defendant in *People v. Patterson*, 2014 IL 115102.  The court rejected the constitutional challenges to the

mandatory juvenile transfer provision. See *Patterson*, 2014 IL 115102, ¶¶ 92-111. However, the court expressed its concern over the lack of any judicial discretion in the transfer process and urged the General Assembly to review the statute in light of the "current scientific and sociological evidence indicating a need for the exercise of judicial discretion in determining the appropriate setting for the proceedings in these juvenile cases." *Patterson*, 2014 IL 115102, ¶ 111. We therefore reject defendant's contention as to the invalidity of the mandatory juvenile transfer provision.

¶ 66                                    IV. Correction of the Mittimus

¶ 67    Defendant finally contends, and the State agrees, that the mittimus, which reflects six convictions for first degree murder, must be corrected. Pursuant to Illinois Supreme Court Rule 615(b)(1) (eff. Aug. 27, 1999), we modify the mittimus to reflect one conviction for first degree murder.

¶ 68                                    CONCLUSION

¶ 69    For the foregoing reason, the judgment of the circuit court of Cook County is affirmed, defendant's sentence is vacated, and the cause is remanded for resentencing consistent with this decision.

¶ 70    Affirmed and remanded with directions.